**DOMINION INVESTMENTS, An Indiana General Partnership, Plaintiff,**

v.

**Edward T. YASECHKO, Quadland Corporation, Ejjy Corporation, and Tewell Corporation, Defendants.**

Civ. No. F 90–82.

United States District Court, N.D. Indiana, Fort Wayne Division.

June 26, 1991.

Gary J. Rickner, Thomas M. Niezer, Barrett & McNagny, Fort Wayne, Ind., for plaintiff.

T. Russell Strunk, Jr., Thomas M. Gallmeyer, Hawk Haynie & Gallmeyer, Fort Wayne, Ind., for defendants.

## MEMORANDUM DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The following Findings of Fact and Conclusions of Law are entered pursuant to Federal Rule of Civil Procedure 52(a), after having examined the entire record and after having determined the credibility of witnesses.

### Findings of Fact

On February 21, 1989, after several weeks of negotiations, an Agreement to Purchase was entered into between Dominion Investments [1], as buyer, and 30/69 Corporation and Wealtha Meek, as sellers, for the purchase of the parcel of land located in Fort Wayne, Indiana, comprising Fortmeyer's Truck Stop, Meek Mack Truck Dealership and the surrounding properties. This property included the real estate which is the subject of this litigation. This Agreement to Purchase specifically recited that it was subject to a lease currently outstanding with Fortmeyers, Inc., the tenants at the truck stop. This lease had a termination option which would allow notice of termination to be given not earlier than August 10, 1989, with a provision that 75 days occupancy would be given after the notice of the termination. By virtue of this clause, Dominion would not be able to obtain possession of the real estate prior to October 25, 1989. This Agreement to Purchase specifically recited that closing was to take place on May 15, 1989.

After the above Agreement to Purchase was executed, Edward T. Yasechko, through realtor Stephen Wesner, expressed an interest in purchasing the Fortmeyer's property. Yasechko, a resident of Ohio, owns a forty percent interest in a family

---

**1.** Dominion Investments is an Indiana general partnership with its principal offices located Fort Wayne, Indiana. Mr. Donald Steininger and Mr. Chris Jones are both partners in Dominion Investments.

corporation, Quadland Corporation. The remaining sixty percent of Quadland's stock is divided equally among his four children. Edward T. Yasechko is also the Assistant Secretary of Quadland Corporation and is the dominating force in all major decisions of the corporation, such as buying real estate. Edward T. Yasechko is also President of Tewell Corporation, another family corporation which operates Yasechko's truck stops, and owns ninety percent of Tewell's stock. Edward J. Yasechko, the son of Edward T. Yasechko, is President of Quadland Corporation and is also an officer of Tewell Corporation in which he owns a ten percent interest. Edward J. Yasechko is also the majority shareholder of defendant EJJY Corporation.

On March 8, 1989, Chris Jones and Don Steininger as sellers, and Edward T. Yasechko, as buyer, entered into an Agreement to Purchase Real Estate (Purchase Agreement) for the sale of the Fortmeyer's property, commonly known as 3039 Goshen Road, Fort Wayne, Indiana. Stephen Wesner, the listing agent for the real estate, prepared the Purchase Agreement and accepted Yasechko's earnest money of $14,-800.00.

The Purchase Agreement entered into by Edward T. Yasechko and Chris Jones and Don Steininger on March 8, 1989 contained the following relevant provisions (underlined portions denote hand or typewritten provisions; all other words are preprinted):

6.01. Seller shall deliver possession of the real estate to Buyer <u>at closing subject to tenants rights.</u>

\*      \*      \*      \*      \*      \*

10.01. At the time Buyer's offer is made and as part of it, Buyer has deposited the sum of <u>$14,800.00</u> as earnest money.

\*      \*      \*      \*      \*      \*

11.01. The closing date shall be on or before <u>May 15, 1989</u>, subject to the provisions of Subsection 17.01.

\*      \*      \*      \*      \*      \*

Section 12. OTHER PROVISIONS: <u>Buyer indemnify Seller on EPA issues.</u>

<u>Buyer to mound and plant common property lines. Buyer to grant a 50' easement for ingress/egress to the property to north and west as per the survey. Bldgs A & C to be torn down in a 12 month period. Bldg B to be torn down within six mo. after AGA Fleet Products lease expiration.</u>

\*      \*      \*      \*      \*      \*

17.01. Closing shall be held on the later of: (a) the date stated in Subsection 11.-01; or (b) the date all conditions imposed by this agreement are satisfied [for example, title requirements are met, financing is available (if applicable), and surveying is completed]. The time and place of closing shall be agreed by the parties in good faith. Either party may, for convenience or accommodations of a closing agent or a lender, extend the closing date for not more than fifteen (15) days provided that the extension does not cause the Commitment to expire....

\*      \*      \*      \*      \*      \*

17.05. If this transaction is not closed for failure of title to meet legal requirements, or for failure of Seller to convey by Deed as required, or to execute and deliver a contract, or other document as required, in each case as of the time of closing, buyer may terminate this Agreement (all earnest money to be returned without delay), and also pursue appropriate remedies available under Subsection 19.03.

\*      \*      \*      \*      \*      \*

19.02. If Buyer breaches any of his obligations in this Agreement, Seller shall be entitled to recover, in addition to any remedies available under this Agreement, all reasonable costs and expenses, including attorney fees, incurred by Seller in enforcing Buyer's obligation.

\*      \*      \*      \*      \*      \*

22.02. Time is of the essence of this Agreement.

Section 6.01 of the Purchase Agreement initially recited that possession would be given by October 31, 1989. However, at Edward T. Yasechko's suggestion, Wesner

changed it to provide that Seller would deliver possession "at closing subject to tenant's rights." Wesner represented to Yasechko that Fortmeyers had the right to occupy the premises until October 25, 1989, but that Wesner would attempt to negotiate an early termination of that lease.

In the section of the Purchase Agreement entitled "Conditional Acceptance by Seller [Counteroffer]," the following provision was stated:

The Seller accepts the offer made by Buyer, SUBJECT, HOWEVER, TO THE FOLLOWING PROVISIONS: Buyer's acknowledging that Seller has fully executed Agreement to Purchase Real Estate and this transaction is contingent upon said purchase being completed. Purchase price to be $1,525,000.00.

Under the section entitled "Buyer's Acceptance of Seller's Counteroffer" was the following provision:

Buyer accepts and agrees to the provisions set forth above and Seller's counteroffer except purchase price of $1,500,-000.00.

At the bottom of the Purchase Agreement was typed the following provision:

Seller's accept Buyer's purchase price of 1,500,000.00.

On May 8, 1989, Attorney Robert York, Edward J. Yasechko and Edward T. Yasechko were present at a meeting in Fort Wayne with the partners of Dominion Investments, Chris Jones and Donald Steininger, to discuss the closing to be held on May 15, 1989. At that meeting, Dominion presented York with original drafts of the following documents referenced in the "Other Provisions" of Section 12 of the Purchase Agreement:

a. Grant of Easement;

b. Easement Improvement Agreement;

c. Agreement regarding destruction of improvements on the Real Estate and rental payments therefrom;

d. Indemnity and Hold Harmless Agreement;

e. Waiver of Building Lien Violation;

f. Bill of Sale and Agreement to Indemnify.

However, much of the meeting was devoted to discussion of the possibility of the early termination of the lease agreement with the tenant on the Fortmeyer's property. At no time during this meeting did Robert York, Edward J. Yasechko, or Edward T. Yasechko indicate an unwillingness to execute the above-described documents.

Unable to get Jones and Steininger to agree to a modification of Section 6.01 of the Purchase Agreement, which concerned the subject of the tenant's rights, at the May 8, 1989 meeting, Edward T. Yasechko decided he did not want to close on the subject real estate in accordance with the terms of the Purchase Agreement. In fact, Yasechko had been displeased with the terms of the Purchase Agreement practically since the date he signed it. Yasechko's displeasure is evidenced by the fact that in mid-March 1989, when Chris Jones visited Yasechko's North Baltimore, Ohio truck stop, York introduced himself to Jones and informed Jones that he was going to "undo" the March 8, 1989 Purchase Agreement. At the time Jones did not give much thought to York's remark, which was made during a cocktail party. Even after the May 8 meeting, Yasechko and York, on behalf of Quadland, continued to negotiate over the terms of the instruments to be given pursuant to Section 12 with Jones and Steininger and did not inform them of Yasechko's intention to withdraw from the deal.

As part of the scheme to "undo" the Purchase Agreement, York advised Yasechko that if Quadland, as opposed to Yasechko, took title to the real estate, Yasechko could avoid the obligations imposed under the Purchase Agreement. York advised Yasechko that the Purchase Agreement lapsed on May 15, 1989 if the deal was not closed on that date, and if the closing date was not extended for any of the reasons set forth in Section 17.01. Thus, in a letter dated May 10, 1989, York advised Steininger that Quadland, rather than Yasechko, would be taking title to the real estate. On this same date York sent a letter to Kathy Hanley of Three Rivers Title requesting that she provide "information to Quadland Corporation, the assignee

of the interest of Edward T. Yasechko as Purchaser in the Agreement to Purchase 10.19 acres from Chris Jones and Don Steininger." However, Dominion was not informed of the motive underlying Yasechko's desire to have Quadland take title to the real estate.

On May 10, 1989, Robert York, on behalf of Quadland Corporation, faxed a letter to Don Steininger which requested various documents, such as copies of all the proposed deeds, to be sent to York that day and also documents to be provided no later than Friday, May 12, 1989, such as the surveyor's certificate and affidavits from the selling parties. In that letter York also stated: "I am enclosing your proposed Indemnity and Hold Harmless Agreement to be executed by Quadland showing necessary additions and deletions.... Your full and prompt compliance with the requests stated herein is necessary to insure the closing of this transaction on May 15, 1989." Despite these statements, which clearly indicated that Quadland was a party to the March 8, 1989 Purchase Agreement, York and Quadland had no intention of signing any of the documents related to the provisions of Section 12 of the Purchase Agreement. Furthermore, such intention was never communicated to Dominion. Instead, York made corrections on the Indemnity and Hold Harmless Agreement and returned it to Steininger which gave the appearance that Quadland would be bound by the Purchase Agreement. On May 13, 1989, two days prior to the closing date set out in the Purchase Agreement, Dominion's conversations with Robert York confirmed that representatives of Quadland would be in Fort Wayne on May 15, 1989 for the closing.

On Monday, May 15, 1989, Robert York, acting as Quadland's attorney, and representatives of Quadland (Edward J. Yasechko, President, Larry Dietz, Controller, and Steve Lucack, Operations Manager) came to Fort Wayne to close on the Purchase Agreement signed by Edward T. Yasechko, and by their appearance acknowledged that Quadland did not want to be accused of breach of the Purchase Agreement. However, it became apparent early on that there were too many "loose ends" and that the closing would not take place on May 15th. These loose ends resulted from the complexity of the transaction as two sellers, Wealtha Meeks and 30/69 Corporation, were to convey a large block of property to Dominion, and then Dominion was to convey a portion of the total acreage to Quadland. Specifically, there were a number of questions that remained unresolved between Wealtha Meeks and 30/69 Corporation, from whom Dominion was to purchase the property. The sellers would not convey the property until they resolved these issues between themselves. There were also unresolved issues between Dominion and Quadland such as the exact description and ownership of the portion of the property subject to the right-of-way of an adjacent street. Mr. York wanted the conveyance to include only the property up to the right-of-way as opposed to the conveyance including the property up to the center of the street. Establishing the boundaries of the right-of-way was a difficult problem for the surveyor. These substantial survey problems were worked out on May 16th and May 17th and the documents relating to it were documents which both parties were interested in seeing generated.

Everyone left the closing office on May 15th with the understanding that all the parties were working toward a closing later that week but no specific date was set at that time. Later everyone agreed to be available on Friday, May 19th to close both of the real estate transactions. Dominion was led to believe that the Quadland representatives would return on May 19th, when the title company and the parties were ready to conclude the closing, and that the representatives would sign Dominion's documents at that time.

On Wednesday, May 17, 1989, Don Steininger faxed all of the Section 12 Documents to Quadland for its final approval and signature. On Friday, May 19, 1989, the title company had finished preparing for the closing, the survey had been completed, and all of the parties involved in the two real estate transactions that were to be simultaneously closed, except for Quad-

land, were present and prepared to close on the transactions as scheduled. Quadland, however, did not come to Fort Wayne as it had represented. Chris Jones contacted Quadland by phone and informed it that all the parties in the simultaneous closing were present and prepared to close except for Quadland. Jones stated that if Quadland did not close on that date, Dominion would retain the earnest money and sell the property to another buyer. Jones informed Quadland that it had until 1:30 p.m. that day to tender the purchase price or Dominion would consider the contract in default. York knew that the closing was to be a simultaneous closing and that Dominion would have to receive title to the property from third parties before it could convey the title to Quadland. In order to get title from the third parties, Dominion needed the purchase money from Quadland. Because Quadland had given the appearance by its statements and actions that it would be bound by the Purchase Agreement, Dominion came to the closing assuming it would have Quadland's money to pass on as part of Dominion's purchase money for the real estate from the third parties. Therefore Dominion did not arrange for alternate financing and went to the closing with no way to purchase the real estate from the third parties except with Quadland's money. The court finds that the conduct of Quadland's representatives evidences that they intentionally did not come to Fort Wayne on the closing date because they believed that Dominion could not close, would be in default under its purchase agreement with the third parties, and Quadland would have the opportunity to purchase the real estate directly from the third parties at a lower price and without the Section 12 obligations.

At 1:00 p.m. on May 19th, Robert York, on behalf of Quadland, telephoned the offices of Mr. Michael Mustard, the attorney for Wealtha Meek, and spoke with Ernest Evans, the representative for Three Rivers Title, the company which would be issuing the title insurance policy on the real estate Dominion was to convey to Quadland. York informed Evans that Quadland was faxing closing instructions to Mr. Mus-

tard's office and would be releasing the purchase money to an escrow account Quadland had at Lincoln National Bank. The balance of the purchase price of $1,500,000.00 was transferred on that day from Quadland Corporation to Dominion Investments. Also on that day, a warranty deed was conveyed to Quadland Corporation by Dominion Investments, which document accurately sets forth the legal description of the Goshen Road real estate.

Although Chris Jones and Don Steininger had entered into the Purchase Agreement in their individual capacities, their partnership, Dominion Investments, conveyed the property. Similarly, Edward T. Yasechko's corporation, Quadland, accepted conveyance of the property as Quadland owns all the real estate that Yasechko has developed. This act of having the entities, rather than the principals, close on real estate transactions and convey or accept conveyance of property is a common practice in the Fort Wayne/Allen County community. The parties have stipulated that no assignment or written document of any form exists whereby Edward T. Yasechko granted to Quadland Corporation his rights and liabilities in the Agreement to Purchase Real Estate of March 8, 1989. However, as Ernie Evans of Three Rivers Title testified, the transfer of rights and obligations from principal to entity is rarely documented by a written assignment and is merely a "technical inconvenience" to the closing agent.

Throughout the four weeks following the May 19th closing, Steininger made several phone calls to Robert York at Quadland and left messages requesting that the documents relating to Section 12 of the Purchase Agreement be executed. Although it is clear that Quadland never intended to execute the documents, neither York nor any representative of Quadland responded to Steininger's messages to inform him of Quadland's position. On July 6, 1989, Steininger telephoned Edward J. Yasechko, President of Quadland, and talked with him about the outstanding documents in the real estate transaction. Yasechko indicated that he did not perceive that there

was a problem even though he knew at that time that Quadland did not intend to sign the documents.

Finally, on August 16, 1989 Steininger sent a letter to Robert York detailing the documents which needed to be completed pursuant to the closing of May 19, 1989 and informed York that Dominion was considering filing a lawsuit. Dominion did not receive a response to Steininger's letter and thus Dominion filed a lawsuit against Quadland in Allen Superior Court on August 23, 1989, requesting a court order directing Quadland to execute the documents necessary to give effect to the March 8, 1989 Purchase Agreement.

In January 1990, Edward T. Yasechko indicated that he wished to discuss purchasing additional land from Dominion and that he was willing to discuss the lawsuit. However, Yasechko stated that he never negotiated with anyone who had a lawsuit outstanding against him. Consequently, Dominion proposed to Quadland that it would dismiss the lawsuit if Quadland would propose a date at which it would come to Fort Wayne to negotiate in good faith. Quadland accepted this proposal and represented that it would come to Fort Wayne on Friday, January 26, 1990, for this purpose. On January 23, 1990, Dominion dismissed its state court suit without prejudice.

On Friday, January 26, 1990, Edward T. Yasechko came to Fort Wayne and met with Steininger, Jones, and Stephen Wesner to discuss the purchase of additional real estate from Dominion, a purchase price for the additional property, and the fact that if the additional property was purchased, the documents regarding the easement which had never been signed by Quadland would no longer be an issue. Yasechko represented that he would have the property appraised and make Dominion an offer. After this meeting, many phone calls were exchanged between Wesner and Yasechko. However, no progress was made on either the execution of the documents or on the sale of additional real estate.

On May 21, 1990, Dominion Investments filed the present lawsuit against Edward T. Yasechko[2] and Quadland Corporation. In Count IV of their complaint plaintiffs allege that "Yasechko and Quadland have failed to provide Dominion with adequate consideration pursuant to the terms of the Sale Agreement for the sale of the Real Estate and Dominion seeks rescission of the Real Estate transaction." Essentially, plaintiff is claiming that the defendants' failure to comply with the terms of the Agreement has deprived the plaintiff of a substantial portion of the consideration for which it bargained for.

Following the closing on May 19, 1989 Quadland Corporation deeded a portion of the acreage to EJJY Corporation and Tewell Corporation who were named as additional defendants/counterclaimants in this case shortly before the case was tried. The defendants have made improvements to the parcel of real estate including the construction of a convenience store on the portion of land deeded to Tewell. This convenience store has a projected annual net profit of approximately $200,000.00. Dominion has not tendered to the defendants the sale price of the real estate or the cost of the defendants' improvements to the real estate.

Prior to the filing of this lawsuit Quadland Corporation negotiated to sell a small portion of the subject real estate to McDonalds Corporation. Three Rivers Title Company performed the title work on the transaction and issued a title insurance commitment before this suit was filed. However, this commitment was amended several times and during the course of amending the commitment Three Rivers Title discovered the pendency of this lawsuit and made an exception to the title insurance.

On July 27, 1990, Dominion filed a Lis Pendens Notice concerning the real estate in question with the Clerk of the Circuit

---

**2.** Dominion incorrectly named Edward J. Yasechko as defendant when it initially filed its lawsuit. However, this error was later corrected and Edward T. Yasechko was identified as the proper defendant.

and Superior Courts of Allen County. Three Rivers Title became aware of the lis pendens notice and required the release of the notice before insuring the title. McDonalds Corporation would not close until the title was insured and thus the sale to McDonalds Corporation was delayed. However, pursuant to stipulation of the parties and consent by the court, a certain 1.92 acre parcel of real estate was released from both the lis pendens notice and this lawsuit to permit defendants to convey marketable title to McDonald's Corporation, which occurred through a real estate closing on October 24, 1990.

### Conclusions of Law

This court has jurisdiction founded upon diversity of citizenship and an amount in controversy pursuant to 28 U.S.C. § 1332.

In this case, plaintiff, Dominion Investments, seeks specific performance, compensatory damages, and punitive damages. The basis for Dominion's claims is the premise that the March 8, 1989 Purchase Agreement represents a valid and enforceable contract against the defendants, Edward T. Yasechko and Quadland. Dominion alleges that, as a result of their failure to execute the Section 12 documents, Yasechko and Quadland have breached their obligation as buyer under the terms and conditions of the Purchase Agreement. In their counter-claim, defendants allege that the plaintiff's action of filing this complaint has slandered the title to the real estate owned by Quadland Corporation, Tewell Corporation, and EJJY Corporation. Plaintiff denies that slander of title has occurred and submits that any difficulties the defendants have had in providing marketable title to the 9.84 acres is solely a result of the defendants' own conduct in failing to comply with the terms and conditions of the Purchase Agreement.

Dominion argues that two theories support its contention that the Purchase Agreement is an enforceable contract. First, Dominion claims that Quadland ratified Edward T. Yasechko's contract with Chris Jones and Don Steininger; second, Dominion claims that Yasechko assigned

the contract to Quadland under the doctrine of equitable assignment.

■ Ratification is a question of fact and is defined as adoption of that which was done for and in the name of another without authority. *Beneficial Mortgage Co. v. Powers*, 550 N.E.2d 793, 796 (Ind. App.1990); *Guaranty Bldg. and Loan Co. v. Wiley*, 100 Ind.App. 438, 196 N.E. 153, 154 (1935). A ratification does not occur unless it appears that the act was performed for and on behalf of another, and not on account of the actor himself. *Beneficial Mortgage*, 550 N.E.2d at 796; *Bryan v. Pommert*, 110 Ind.App. 61, 37 N.E.2d 720 (1941). One may ratify another's unauthorized acts through silence and acceptance of the benefits attaching to such acts. *Wright v. State*, 266 Ind. 327, 363 N.E.2d 1221 (1977).

■ In this case, Quadland ratified Edward T. Yasechko's act of entering into the Purchase Agreement with Chris Jones and Don Steininger. First, it is clear from the evidence that Yasechko was acting for and on behalf of Quadland when he entered into the purchase agreement. Quadland owns the real estate on all truck stops in which Yasechko is involved. Also, Edward T. Yasechko and his son, Edward J., are the only shareholders of Tewell Corporation, which is the operating entity of the truck stops, and Edward T. owns 90% of Tewell's stock. Further, Edward T. is clearly the dominating force in all major decisions affecting the "family corporations", such as purchasing real estate.

Next, Quadland Corporation's own acts evidence that it ratified the act of Edward T. Yasechko, of entering into the Purchase Agreement with Chris Jones and Donald Steininger. Quadland appeared in Fort Wayne on May 8, 1990 and prior to closing by its attorney, Robert York, and its president, Edward J. Yasechko, together with Edward T. Yasechko, to negotiate over the form of the Section 12 documents relating to the Purchase Agreement. Quadland returned a corrected version of the Indemnity and Hold Harmless Agreement by cover letter prepared by Quadland's attorney, Robert York, dated May 10, 1990 with the

statement that the document was "to be executed by Quadland". Quadland asked for Don Steininger's full and prompt compliance with the request, sent by its attorney, Robert York, in his May 10, 1990, letter, in order to "insure closing of the transaction on May 15, 1989," in accordance with the Purchase Agreement. Quadland failed to communicate at any time prior to May 15, 1990, or at any time thereafter prior to the filing of suit, that Quadland did not intend to be bound by the provisions of the Purchase Agreement.

It is a common practice in the Fort Wayne/Allen County community for the principals of a corporation or partnership to enter into a real estate contract in their own names and then have the corporation or partnership conclude the deal. In fact, in this case, Don Steininger and Chris Jones personally entered into the Purchase Agreement with Edward T. Yasechko, but the title to the property was conveyed by their partnership, Dominion Investments. Thus, there was nothing unusual in the fact that Quadland concluded a deal and accepted title to property in which Edward T. Yasechko had signed the Purchase Agreement. Thus, the court concludes that Edward T. Yasechko was acting on behalf of Quadland when he entered into the Purchase Agreement, and that Quadland ratified Yasechko's act. Consequently, Quadland is bound by the provisions contained in the Purchase Agreement.

■ The court finds that York and Yasechko erred in believing that Yasechko could simply walk away from the Purchase Agreement if the closing did not take place on May 15th. First, the Purchase Agreement at Section 17.01 states that the closing date is to be extended until surveying is completed. Surveying was not yet complete on May 15th. Second, Section 17.01 states that the closing date is to be extended for the convenience of the closing agent. In this case, the closing agent was not able to prepare the closing documents on May 15th because none of the parties were ready to close. Third, Section 17.01 states that the time and place of closing shall be agreed by the parties in good faith. Here,

the parties each agreed to work on getting their business in order in time to close by the end of the week and then agreed to meet on Friday, May 19th for the closing. Fourth, Section 17.05 states that if the transaction is not closed for specified reasons, "buyer *may* terminate this Agreement." (Emphasis provided). Clearly, Section 17.05 implies that the buyer is required to give notice to the seller if the buyer elects to terminate the Purchase Agreement. In this case, Yasechko not only failed to notify Dominion of his desire to avoid the Agreement, he continued to act as though he intended to fully comply with all of the terms of the Purchase Agreement.

■ Next, the court will consider plaintiff's claim that an equitable assignment occurred. Since equity disregards mere form, no particular words or particular form of instrument is necessary to effect an equitable assignment, but any language, however informal, if it shows the intention of the owner of a chose in action to transfer it so that it will be the property of the transferee, will amount to an equitable assignment. 6 Am.Jur.2d, *Assignments* § 83 (1963). However, where the statute of frauds applies, the general rule is that an assignment must likewise be in writing. *Id.* at § 86. The Indiana Statute of Frauds, I.C. 32–2–1–1, provides that:

No action shall be brought in any of the following cases:

   *     \*     \*     \*     \*     \*

Fourth. Upon any contract for the sale of lands;

   *     \*     \*     \*     \*     \*

Unless the promise, contract or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized, . . . .

Pursuant to a stipulation set forth in the parties pre-trial order, approved by this court on November 9, 1990, the parties have agreed that, "No assignment or written document of any form exists whereby

Edward T. Yasechko granted to Quadland Corporation his rights and liabilities in the Agreement to Purchase Real Estate of March 8, 1989." Thus, there is no writing which satisfies the statute of frauds requirement and the defendants conclude that any alleged oral contract assigning the March 8 contract from Mr. Yasechko to Quadland is unenforceable. However, the question before the court is not whether the assignment is enforceable as between Yasechko and Quadland but whether Dominion has the right to enforce the March 8 contract against Quadland, as assignee of Yasechko. There is no legal authority to support defendants' apparent contention that the assignment between Yasechko and Quadland must have been in writing in order for Dominion to be able to enforce the contract for the purchase of land against Quadland, as assignee.

The court finds that an assignment existed between Yasechko and Quadland. York, as attorney for Quadland, represented that Quadland was the assignee of Yasechko's interest under the Purchase Agreement. Indiana law is clear that an assignee of a contract takes the assignor's rights, and also becomes subject to the assignor's burdens. *Lake County Trust Co. v. Household Merchandising, Inc.*, 511 N.E.2d 512, 514 (Ind.App.1987). Furthermore, the assignor remains liable on the contract assigned unless the other contracting party has consented to release him. *Boswell v. Lyon*, 401 N.E.2d 735, 743–44 (Ind.App.1980). Consequently, Quadland, as assignee of the Purchase Agreement, is liable for failure to perform under the contract, and since there is no evidence that Dominion released Yasechko from his obligations under the Purchase Agreement, Yasechko continues to be liable for Quadland's failure to perform under the contract. However, Dominion did not present any evidence at trial which would show that Tewell or EJJY are liable under the contract. Nor did Dominion make any arguments, either during final arguments or

in its post-trial briefs, that it is entitled to recover from Tewell or EJJY[3]. Consequently, the court finds that Tewell and EJJY are not liable to Dominion for breach of the Purchase Agreement.

Next, the court will determine whether any of the defendants committed constructive fraud. Constructive fraud is fraud that arises by operation of law from conduct which, if sanctioned by law, would secure an unconscionable advantage. *Lawshe v. Glen Park Lumber Co.*, 176 Ind.App. 344, 375 N.E.2d 275, 278 (1978); *Hoosier Ins. Co. v. Ogle*, 150 Ind.App. 590, 276 N.E.2d 876 (1971). A claim of constructive fraud can be based on promissory misrepresentations if the misrepresentations are false, cause a reliance upon such representation to the detriment of the promisee, and create an advantage for the promisor. *Eby v. York–Division, Borg–Warner*, 455 N.E.2d 623, 628 (Ind.App. 1983); *Blaising v. Mills*, 176 Ind.App. 141, 374 N.E.2d 1166 (1978); *Lawshe v. Glen Park Lumber Co.*, 176 Ind.App. 344, 375 N.E.2d 275 (1978). In the case at bar, Edward T. Yasechko and Quadland purposely and maliciously misrepresented to Dominion that Quadland intended to take title to the real estate as an assignee of Edward T. Yasechko and that Quadland had intended to ratify the terms of the Purchase Agreement and thus became bound by all of the obligations contained therein. These representations were false as Quadland never intended to be bound by the Purchase Agreement. Dominion relied on these misrepresentations and conveyed the real estate to Quadland. Quadland's refusal to execute the Section 12 documents deprived Dominion of valuable consideration due under the Purchase Agreement and enabled Quadland to obtain title to the real estate. Thus, the court finds that Edward T. Yasechko and Quadland committed constructive fraud and Dominion is therefore entitled to punitive dam-

---

3. The court notes that plaintiff stated at final arguments that any judgment against Quadland and Edward T. Yasechko should also be directed to the successor corporations, Tewell and

EJJY. However, plaintiff has never provided the court with any basis for finding EJJY and Tewell liable.

ages. *Spinsky v. Kay*, 550 N.E.2d 349 (Ind.App.1990).

Next, the court will address defendants' counterclaim for slander of title. Slander of title occurs when a party maliciously makes false statements regarding some claim in or to the real estate of another which statements cause pecuniary harm to the titleholder. In the present case, the plaintiff filed a complaint with a claim of rescission claiming entitlement to rescind the entire transaction. This rescission claim effectively clouded the title to the 9.84 acre parcel of real estate. The pending rescission claim impeded the defendants' efforts to close on their sale to McDonalds Corporation. The question for the court is whether plaintiff had any reasonable basis for its rescission claim in the first instance.

A plaintiff, when seeking to rescind a contract, need only prove his right to rescind and that he is able to return in species any property he has received under the contract or its reasonable value if a return in species is impossible. *Grissom v. Moran*, 154 Ind.App. 419, 292 N.E.2d 627, 629 (1973). Furthermore, a party seeking to rescind a contract must do so at the earliest practicable moment after discovery of the facts which would entitle the party to rescission. *Griffin v. Axsom*, 525 N.E.2d 346 (Ind.App.1988).

In this case, plaintiff had a right to rescind the Purchase Agreement when the defendants breached the Agreement by failing to execute the Section 12 documents. Although the claim for rescission was brought twelve months after the execution of the deed at issue, the court finds that plaintiff was able to return the purchase price when the claim was filed. The court further finds that the claim was brought within a reasonable time of discovering that Quadland would not honor the Section 12 obligations. As the facts set out above indicate, Quadland acted in bad faith and led Dominion to believe that Quadland would eventually sign the documents. Dominion spent months attempting to get a definite response from Quadland as to when Quadland would execute the documents. Dominion finally resorted to a rescission lawsuit in state court. However, Quadland persuaded Dominion to abandon the state court suit by promising to negotiate and then failed to live up to its promises.

Clearly, Dominion did not fail to exercise reasonable diligence in discovering fraud but merely gave Quadland the benefit of the doubt regarding the execution of the outstanding documents. Dominion's delay in filing this suit was reasonable in light of the fact that Dominion was repeatedly assured that there was no problem and that the documents would soon be executed. Dominion resorted to filing a federal court suit for rescission only after Quadland's continued inaction confirmed that Quadland never had the intention to execute the documents. Thus, the court finds that Dominion's act of filing the rescission claim does not constitute slander of title. The rescission claim was not false or malicious because Dominion had a competent basis for asserting its claim and did so within a reasonable time.

The court acknowledges that the defendants have vigorously argued that tender is a condition precedent to a rescission claim and that plaintiff failed to tender the purchase price to defendants. The cases that the defendants cite in support of their argument are not persuasive. Defendants' cases merely state that if a party rescinds a contract, he must return any benefits received. The cases do not state that the benefits must be returned or tendered prior to asserting a claim for rescission. *See Indiana & Michigan Electric Co. v. Harlan*, 504 N.E.2d 301 (Ind.App.1987); *Blaising v. Mills*, 176 Ind.App. 141, 374 N.E.2d 1166 (1978). Consequently, plaintiff's failure to tender the purchase price to defendants did not render its rescission claim ill-founded or malicious.

Finally, the court will address Dominion's remedies. It is a matter of course for courts to grant specific performance of a valid contract for the sale of real estate. *Ridenour v. France*, 442 N.E.2d 716, 718 (Ind.App.1982). Having demonstrated the

enforceability of the Purchase Agreement between Dominion and the defendants, Edward T. Yasechko and Quadland, Dominion is entitled as a matter of course to specific performance of the terms of the Purchase Agreement.

First, Dominion is entitled to specific performance of the Indemnity and Hold Harmless Agreement. Accordingly, the defendants are ordered to execute the final version of the Indemnity and Hold Harmless Agreement as set out in Plaintiff's Exhibit 4.

Second, Dominion is entitled to specific performance of the building tear down provision. Accordingly, the defendants are ordered to immediately tear down Building A and Building B.

Third, Dominion is entitled to specific performance of the grant of the easement. The easement agreement did not merge in the deed because it was a collateral agreement which the parties intended would survive the conveyance of the deed. It is clear from the contract and the evidence that the parties did not intend the deed to complete the contract with respect to this easement. Further, the doctrine of merger does not apply where the deed constitutes only part performance of the contract. *Prell v. Trustees of Baird & Warner Mortgage and Realty Investors,* 179 Ind.App. 642, 386 N.E.2d 1221, 1230 (1979). Therefore, the defendants are ordered to grant the easement which is described in the deed. (Exhibit B to Plaintiff's Exhibit 7). Defendants, in their post-trial brief, have agreed that should the court grant specific performance with regard to the easement, then the court should order the defendants to execute a grant of easement as described in Exhibit B to Plaintiff's Exhibit 7.

Lastly, Dominion is entitled to specific performance with respect to Quadland's obligation to "mound and plant" the common property lines. The court finds that the quotation by T & G Excavating, Inc. (Plaintiff's Exhibit 21) is a reasonable description of the work to be performed and orders the defendants to mound and plant the property lines in accordance with that quotation.

Dominion is also seeking damages with respect to Building A which was to be torn down by May 19, 1990, and Building B, which was to be torn down by February 11, 1991. Dominion claims that its property value has been damaged and its overall development plan has been and continues to be impeded by the presence of these buildings. However, there is no convincing evidence in the record to support the claim that Dominion has suffered damages as a result of the presence of either Building A or Building B. Dominion did not restrict the use of Tract One on which the two buildings are situated and defendants could easily put Tract One to a use that would be more detrimental to Dominion's remaining property than the existence of the buildings. Therefore, the court finds that Dominion is not entitled to damages for the delay in the tear down of the two buildings.

Next, Dominion seeks attorney fees and costs pursuant to Section 19.02 of the Purchase Agreement. Since defendants, as buyers, breached their obligations under the Purchase Agreement, Dominion is contractually entitled to recover attorney fees and costs. The exact amount of the award will be determined after briefing by the parties and after a hearing on the issue if necessary.

Finally, Dominion seeks punitive damages on their constructive fraud claim. Having found that the conduct of Edward T. Yasechko and Quadland constitutes constructive fraud the court finds it appropriate to award punitive damages to the plaintiff. The purpose of punitive damages is to punish a defendant for its outrageous conduct and to deter it and others from engaging in similar conduct. *Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244 (N.D.Ind. 1985); *Miller Pipeline Corp. v. Broeker,* 460 N.E.2d 177 (Ind.App.1984). Thus, an award of punitive damages must be of an amount sufficient to punish defendants who have engaged in reprehensible conduct. In order to determine the proper amount of punitive damages to assess, the defendants' economic wealth and income should be considered. *Arlington State*

*Bank v. Colvin,* 545 N.E.2d 572 (Ind.App. 1989). The defendants in this case have convinced this court that they have a highly successful and profitable business enterprise. In fact, the evidence has shown that a single convenience store, such as the one occupying only a portion of the subject real estate, reaps an annual profit of approximately $200,000.00 and this amount represents only a portion of the profits to be realized annually from the subject transaction. Accordingly, the court finds that an award of punitive damages in the amount of $100,000.00 is required to punish Edward T. Yasechko and Quadland and deter them from engaging in similar conduct in the future.

#### Conclusion

Plaintiff has established by a preponderance of the evidence that defendants breached their obligations under the Purchase Agreement and that the defendants committed constructive fraud. It is hereby ORDERED, ADJUDGED, and DECREED that the defendants, Edward T. Yasechko and Quadland, shall specifically perform the obligations of the Purchase Agreement as follows:

(1) Defendants shall execute the final version of the Indemnity and Hold Harmless Agreement as set out in Plaintiff's Exhibit 4;

(2) Defendants shall immediately tear down Building A and Building B;

(3) Defendants shall grant the easement which is described in the deed (Exhibit B to plaintiff's Exhibit 7); and

(4) Defendants shall mound and plant the property lines in accordance with the quotation by T & G Excavating, Inc. (Plaintiff's Exhibit 21).

Plaintiff is awarded punitive damages against Edward T. Yasechko and Quadland in the amount of $100,000.00 [4].

Plaintiff is ORDERED to file a motion for fees and costs within twenty days from the date of this order, detailing its request for fees and costs.

---

**4.** In accordance with the Deposit Agreement filed by the parties on October 16, 1990, (¶ 3A), plaintiff shall be paid $100,000.00 out of the $200,000.00 deposit. Additionally, any subsequent award to plaintiff of attorney fees and costs shall be paid out of the $200,000.00 deposit. The remainder of the deposit shall be held until the defendants have complied with the specific performance requirements as set forth in this order.