**F. McCONNELL & SONS, INC., Plaintiff,**

v.

**TARGET DATA SYSTEMS, INC., Defendant.**

No. 1:98–CV–312.

United States District Court, N.D. Indiana, Fort Wayne Division.

Feb. 9, 2000.

Alan VerPlanck, James Fenton, Eilbacher Scott Inc, Fort Wayne, IN, for F. McConnell and Sons, Inc., Plaintiff.

Martin T Fletcher, Sr, Rothberg and Logan, Fort Wayne, IN, Brian P Daniels, Brenner Saltzman and Wallman, New Haven, CT, for Target Data Systems Inc, defendants.

## MEMORANDUM OF DECISION
## AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the Court on plaintiff/counterdefendant F. McConnell & Sons, Inc.'s (M & S) April 27, 1999 "Motion to Dismiss Portions of Defendant's Counterclaim." Also before the Court is plaintiff's "Motion to Strike the First Affirmative Defenses of Defendant Target Data Systems, Inc." filed that same date. Defendant Target Data Systems, Inc. (Target)—after a stay pending mediation was entered then lifted—responded to those motions on December 16, 1999 to which plaintiff filed its reply on January 11, 2000. For the following reasons, the motion to strike will be granted while the motion to dismiss will be granted in part and denied in part.

### Discussion

This diversity action was filed by plaintiff M & S alleging that defendant Target did not pay appropriate commissions in connection with certain software development purportedly conducted by M & S pursuant to an agreement entered into between Target and M & S in June 1994. After briefing and subsequent ruling on a motion to dismiss, M & S filed its First Amended Complaint on February 22, 1999 to which Target filed its Answer, Affirmative Defenses and Counterclaims on March 24, 1999. It is that latter filing which is the subject of the present motions with plaintiff moving to dismiss defendant's fraud, I.C. 34-24-3-1, rescission, and reformation counterclaims, and with plaintiff moving to strike defendant's fraud in the inducement defense. That defense and those counterclaims all flow from defendant's allegations that plaintiff intentionally misrepresented its then-present state of mind with respect to plaintiff's purported

acceptance of the commission structure proposed by defendant.[1]

In considering a motion to dismiss, this Court takes as true the well-pleaded factual allegations of the non-movant and draws all reasonable inferences in its favor. See, *Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir.1999). A motion to dismiss should not be granted unless it appears that the claimant can prove no set of facts in support of its claim which would entitle it to relief. *Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 781 (7th Cir.1999)(citing, *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).[2]

While "Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that a [claimant] plead a 'short and plain statement of the claim showing that the pleader is entitled to relief'" and does "'not require a claimant to set out in detail the facts upon which he bases his claim,' ... FRCP 9(b) embodies the exception to this otherwise lenient rule" by requiring that fraud be pleaded with particularity. *Payton v. Rush–Presbyterian–St. Luke's Medical Center*, 184 F.3d 623, 626–27 (7th Cir.1999)(internal citations omitted). "The higher standard in those cases is warranted by the 'great harm to the reputation of a business firm or other enterprise' a fraud claim can do." *Id.* Other reasons advanced for the heightened pleading requirement for fraud allegations are that "fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it" and that "charges of fraud (and also mistake, the other charge that Rule 9(b) requires to be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships...." *Ackerman v. North-*

---

1. Defendant also asserts that plaintiff never delivered to it a completed software module for incorporation into the base computer program of defendant referenced in the alleged agreement.

2. Importantly, "[a]ffirmative defenses are pleadings and, therefore, subject to all pleading requirements of the Federal Rules of Civil Procedure." *Heller Financial Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir.1989).

*western Mutual Life Insurance Co.,* 172 F.3d 467, 469 (7th Cir.1999)(internal citations omitted).

■■■■ "Rule 9(b) requires heightened pleading of fraud claims in all civil cases brought in the federal courts, whether or not the applicable state or federal law requires a higher standard of proving fraud, which sometimes it does and sometimes it does not." *Id.* By its terms, Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." F.R.Civ.P. 9(b). "The circumstances of fraud or mistake 'include the identity of the person who made the misrepresentations, the time, place and content of the misrepresentation, and the method by which the misrepresentations was communicated to the plaintiff.'" *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir. 1997). These requirements have been described as "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

With those standards in mind, the Court turns to the presently pending motions. Because the affirmative defense and all of the counterclaims which plaintiff finds objectionable flow from the allegations contained in Target's first affirmative defense, subsequent analysis will be aided by setting out those allegations verbatim:

1. Target was incorporated in or about 1988 and has been at all relevant times in the business of developing and licensing computer software design to assist food service distributors in managing every aspect of their business.

2. The first program developed and marketed by Target was the "Distributor 4GL" program which included order processing, routing, payroll, receiving, purchase order processing, inventory control, bin tracking, accounts payable, accounts receivable, general ledger, sales analysis, contracts management, food show processing, bid systems, shel-

tered income process, and system management modules.

3. Broadline food service distributors (that is, entities which distribute food-related products to wholesale distributors) can run every aspect of their company on Distributor 4GL.

4. Distributor 4GL, however, was not designed for entities who distributed products to retail sales locations.

5. In or about March, 1994, Target was contacted by M & S to discuss M & S's licensing from Target certain rights in the Distributor 4GL program.

6. Representatives of M & S, including James McConnell, met with Target representatives in Connecticut in or about May 1994 to see a demonstration of Distributor 4GL and to further discuss the licensing of that product.

7. At the May 1994 meeting in Connecticut, M & S proposed that M & S develop a retail sales module (the "Retail Sales Module") to be incorporated into certain Distributor 4GL packages and that M & S thereafter make itself available as a demonstration site and sales resource upon successful development and incorporation of such a Retail Sales Module.

8. During the negotiations regarding the details of the relationship proposed by M & S, M & S did request a compensation structure whereby M & S, in exchange for its own performance, would receive a commission on all licensing by Target of Distributor 4GL, regardless of whether the licensed product included the Retails Sales Module, but Target rejected that compensation structure and such rejection was communicated to M & S.

9. As a counteroffer, Target proposed a compensation structure whereby M & S would be paid a commission on the licensing of only those Distributor 4GL programs which included the Retails Sales Module.

10. The specific compensation structure proposed by Target was that M & S

would receive a commission of 10% of only those license fees received with respect to the contemplated Distributor 4GL/Retail Sales Module Package.

11. The exception to this 10% commission rate (that is, payment of only a 5% commission) would apply if the licensee prospect was a member of a buying group with a prior royalty arrangement because of additional expenses which would be incurred by Target in commercial dealings with any such group member.

12. The counteroffer was accepted by M & S during a June 2, 1994 telephone conversation with a representative of Target.

13. On or about June 3, 1994, the letter attached to M & S's First Amended Complaint as *Exhibit A* (without handwritten notations) was forwarded to M & S confirming, as a proposal, the general terms of the agreement reached on June 2, 1994 (the "Proposal Letter").

14. Upon information and belief, upon M & S's receipt of the Proposal Letter, M & S, contrary to its prior representation as described above, secretly viewed the language set forth in Paragraph 3 of the Proposal Letter as creating the opportunity for M & S to claim at some subsequent date an entitlement to commissions on all Distributor 4GL license fees received by Target, not simply an entitlement to commissions on only those fees derived from the Distributor 4GL package which included M & S's Retail Sales Module.

15. With the fraudulent, undisclosed intent of subsequently making such a claim if it were in M & S's best interests, M & S immediately signed and returned the Proposal Letter fraudulently representing M & S's agreement to the terms thereof (rather than negotiating the terms of a formal contract in which more detailed language would appear).

16. The above 1994 beliefs and intentions of M & S were disclosed to a representative of Target in a telephone conversation in or about August 1998, in which conversation M & S admitted, *inter alia,* that, upon receipt of the Proposal Letter, M & S "couldn't sign it fast enough."

17. At no time prior to August 1998 did M & S ever advise Target that M & S believed that Target owed M & S 10% of the license fees being received by Target with respect to those Distributor 4GL programs which did not include M & S's proposed Retail Sales Module.

18. At no time to the present has M & S ever delivered to Target a completed Retail Sales Module for incorporation into Distributor 4GL.

19. Target was fraudulently induced by M & S to enter any contract under which M & S now asserts its various claims, and there, any such contract is unenforceable by M & S.

(Rec.26, pp. 4–7).

Given the foregoing allegations, the Court is of the view that the defendant has pled fraud with sufficient particularity required by F.R. Civ. P. 9: it has identified the who, what, when, where and how. While the first paragraph of the newspaper article has been written, the story is not at an end, however, for there still remains the question of whether a claim has been stated which would entitle the defendant to relief. The Court is of the view that one has not insofar as it hinges on fraud.

■ "Actual fraud consists of five elements: 1) that there was a material representation of *a past or existing fact;* 2) that the representation was false; 3) that the representation was made with knowledge of its falsity; 4) that the complainant relied on the representation; 5) that the representation proximately caused the complainant's injury." *Paulson v. Centier Bank,* 704 N.E.2d 482, 490 (Ind.App.1998)(emphasis in original). Here, any fraud claim falters at the first element because defendant has failed to allege any misrepresentation of past or existing fact which was false. Rather, it alleges that the parties

arrived at an oral agreement under which plaintiff would receive a commission on 4GL Retail Sales Module packages and thereafter defendant forwarded its proposal in writing which provided that plaintiff would receive a commission on all 4GL packages, regardless of whether the Retail Sale Module was incorporated. In essence, the purported fraud consisted of plaintiff representing to defendant during negotiations that it would agree to receive commissions only on the Retail Sales Module packages with plaintiff then "secretly" believing that the document created a right to commission on all 4GL packages and signing and returning the document without advising defendant of what it believed. These allegations, even if true, and even if proved, would not support a claim for fraud.

 "Actual fraud may not be based on representations of future conduct, on broken promises, or on representations of existing intent that are not executed." *Anderson v. Indianapolis Indiana AAMCO Dealers Advertising Pool*, 678 N.E.2d 832, ₊837 (Ind.App.1997)(representations about future benefits under advertising agreement, even if false and misleading, could not support an action for fraud in that they related to future, as opposed to past or existing facts); *see also, Strodtman v. Integrity Builders, Inc.*, 668 N.E.2d 279, 283 (Ind.App.1996)(representations regarding what defendant would do if plaintiff did not oppose development involved future conduct that could not support fraud action). Indeed, " 'actionable fraud cannot be predicated upon a promise

to do a thing in the future, although there may be no intention of fulfilling the promise.' " *Wright–Moore v. Ricoh Corp.*, 908 F.2d 128, 141 (7th Cir.1990).

Here, the allegations even if proved would not constitute actual fraud. It is not a misrepresentation of past or existing fact to represent what one would agree to; to secretly view the contract as having a certain meaning and intend to later claim such a meaning; to sign a contract; or fail to advise the adverse party as to one's belief regarding the contract's meaning.[3]

Such actions, of course, in certain circumstances could support a claim for constructive, as opposed to actual, fraud. In an effort to salvage its fraud claim, defendant suggests that if nothing more plaintiff engaged in constructive fraud by remaining mum about its view of what the proposed contract meant to it.

 "The elements of constructive fraud are: (I) a duty owing by the party to be charged to the complaining party due to their relationship; (II) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (III) reliance thereon by the complaining party; (IV) injury to the complaining party as a proximate result thereof; and (V) the gaining of an advantage by the party to be charged at the expense of the complaining party." *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind.1996). Even under this cause of action defendant has failed to establish a claim of fraud.[4]

To begin with, there is no suggestion that there was any special relationship be-

3. Defendant's citation to *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) does not alter this Court's conclusion. That case was brought pursuant to Section 14(a) of the Securities and Exchange Act of 1934 and while a director of a corporation's statements of reasons or belief may be deemed factual for purposes of Rule 14(a), that has no bearing on whether a claim of fraud is valid under Indiana law particularly since Indiana has not extended the concept of "existing material facts" to include reasons or beliefs. Moreover, the beliefs in *Sandberg* were "subject to

documentation" whereas here plaintiff is accused of failing to state its beliefs as to the legal effect of a contract which, importantly, was proffered by the defendant.

4. In *Hemenway v. Peabody Coal Company*, 159 F.3d 255, 262 (7th Cir.1998), Chief Judge Posner noted that where a party does not sufficiently allege that the other party "told a lie...the district judge [i]s entitled to limit his discussion to the possibility of deceptive omissions. And because plaintiffs related exactly what those omissions were, the judge was entitled to resolve the claim on the merits."

tween the parties as would require plaintiff to speak up. Defendant points to *OVRS Acquisition Corp. v. Community Health Services,* 657 N.E.2d 117, 128 (Ind.App. 1995), among others, for the proposition that co-venturers or partners have a special duty to each other. True, that case speaks in terms of joint ventures and the consequent "fiduciary duty" imposed on fellow joint venturers.[5]

Here, the pleadings do not suggest that there was any special relationship as between the parties. While "Indiana insists that the 'entitlement' or 'duty' part of th[e] formulation for a constructive fraud claim be taken seriously," *Hemenway supra,* 159 F.3d at 261, the Indiana courts also hold that "[w]hether such a relationship exists is essentially a question of fact." *Paulson, supra* at 490. Given that, and further given the fact that defendant is entitled to all inferences and that dismissal is inappropriate unless there are no set of facts which would support its claim, this Court cannot conclude that based upon the absence of a special relationship constructive fraud cannot be shown.[6]

There is, however, something else which is fatal to defendant's constructive fraud claim. In its brief, defendant points out that "this Court expressly has held that a claim of constructive fraud can be based on promissory misrepresentations if the misrepresentations are false, cause reliance upon such representations to the detriment of the promisee, and create an advantage for the promisor. *Dominion In-*

*vestments v. Yasechko,* 767 F.Supp. 1460, 1470–71 (N.D.Ind.1991)." (Rec.40, pp. 5–6). What defendant fails to mention, however, is the language which immediately preceded that just excerpted wherein this Court wrote that "[c]onstructive fraud is fraud that arises by operation of law from conduct which, if sanctioned by law, would secure an unconscionable advantage." 767 F.Supp. at 1470 (citing cases).

█ Here, unlike in *Yasechko,* there is no suggestion that what plaintiff did gave it an unconscionable advantage, and, unlike in *Yasechko,* there is no suggestion that plaintiff made a positive representation which later was determined to be false. Rather, the only action that plaintiff is alleged to have committed is to sign a contractual document which was prepared *by the defendant.* This Court cannot see how it would be unconscionable for one party to the negotiations to adopt as the agreement of the parties a written contract tendered by the other party. As plaintiff points out, to hold otherwise would mean that there would be no commercial contracts which could go unchallenged if this Court were to find such conduct unconscionable. While such conduct might be a sharp business practice and not to be countenanced, it does not mean that the same is unconscionable.

In light of the above, this Court must conclude that under the facts alleged defendant cannot establish a claim of fraud, either actual or constructive. Hence, the motion to dismiss the first counterclaim which alleges fraud[7] and the motion to

---

**5.** A fiduciary relationship in the context of a fraud claim has been described as follows:

> A confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other....Not only must there by confidence by one party in the other, but the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge....Furthermore, it must be shown that the dominant party wrongfully abused this confidence by improperly influencing the weaker so as to obtain an unconscionable advantage.

*Paulson, supra* 704 N.E.2d at 490 (internal citations omitted).

**6.** Strictly read, however, the claim of constructive fraud could conceivably be dismissed for failure to comply with the particularity requirement of Rule 9(b) since no mention is made of a special relationship. That need not be definitively resolved since, in any event, defendant has failed to establish any entitlement to relief.

**7.** That counterclaim reads as follows:

I. *FIRST COUNTERCLAIM—FRAUD*
1–18. Paragraphs 1 through 18 of Target's First Affirmative Defense are hereby

strike the affirmative defense of fraud in the inducement will be granted. That conclusion necessarily means that several of the counterclaims fail as a matter of law since they stem from the same conduct and allegations.

Defendant's third counterclaim which alleges breach of certain Indiana criminal statutes must also be dismissed because that counterclaim too stems from its allegations of fraud. Specifically, after incorporating paragraphs 1 through 18 of its First Affirmative Defense for Fraud in the Inducement, defendant alleges:

> 19. Upon information and belief, by means of M & S's fraudulent misrepresentations and omissions as aforesaid, M & S intended to obtain, and did obtain, control over property of Target, all in violation of both Ind.Code § 35–43–4–3 and Ind.Code § 35–43–5–3.
>
> 20. Upon further information and belief, by means of M & S's fraudulent misrepresentations and omissions as aforesaid, M & S intentionally or knowingly caused Target to suffer pecuniary loss, all in violation of Ind.Code § 35–43–1–2.

(Rec.26, p. 10).

In its response brief, defendant sets forth a two-pronged argument in an effort to salvage its counterclaim based upon alleged violations of the foregoing Indiana criminal statutes. First, it asserts that it has validly stated a claim for fraud and therefore this counterclaim should not be dismissed. Since this Court has already decided otherwise with respect to the pro-

---

restated and realleged as Paragraphs 1 through 18 of this First Counterclaim as if fully set forth herein.

19. Target reasonably and detrimentally relied upon M & S's aforesaid fraudulent misrepresentations and omissions.

20. In light of M & S's fraudulent conduct as aforesaid, Target has suffered damages, for which damages M & S is liable to Target.

(Rec.26, p. 9).

8. Plaintiff also posits that "[t]he Court may well wonder what theses criminal statutes

priety of the claim of fraud, that rationale must be rejected.

Second, defendant asserts that fraud is not a required element of any of the criminal statutes upon which it relies. Even if that is so, however, as plaintiff aptly points out, given the language of the counterclaim as previously set forth, such an "assertion is, at the very least, disingenuous...". (Rec.45, p. 5).[8] The sum and substance of defendant's allegations of criminal statutory violations rest upon its contention that plaintiff committed fraud—indeed, defendant does not deny that, if its fraud allegations are defective and its criminal claims rest on fraud, then this counterclaim must be dismissed. Given the allegations contained in the counterclaim, it is clear that the claim rests upon defendant's contention that plaintiff engaged in fraud. As the drafter of the claim, defendant is the master of its pleading, *see, e.g. Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1075 (7th Cir.1992) and as such can plead itself out of court by pleading assertions which undermine its claim, *see, Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir.1999).

Defendant's fourth counterclaim is for rescission. Insofar as that claim rests upon allegations of fraud, it must fail for reasons already articulated. As an alternative basis for that claim, plaintiff asserts that even if the claim is not based on fraud, defendant has not alleged an essential element for such an action, to wit, that defendant has failed to allege that it stands prepared to restore M & S to the same condition it occupied before making the alleged contract.[9] In response, defendant

---

have to do with the garden variety breach of contract issues in this case." (Rec.33, p. 5). That is indeed an interesting question but one which this Court need not speculate about.

9. In support of its position regarding the elements required to support a rescission claim, plaintiff cites *Barrington Mgt. Co. v. Draper Family, Ltd.*, 695 N.E.2d 135, 140 (Ind.App. 1998). Defendant does not contend that an essential element of rescission under Indiana law is that the party seeking rescission of a contract return or offer to return all of benefits received by it under the contract.

asserts "that the pleading rules of federal court only require that the other party have 'fair notice' of what claims have been asserted against it and the grounds upon which the claims rest" and "[t]hus, to the extent that M & S's motion simply is based upon the argument that Target has failed to allege all of the elements of its common law claim, M & S's motion must be denied."

In this Court's view, the failure of defendant to allege that it has or stands willing to return the benefits it has received is fatal to its plea for rescission. "A complaint must contain either direct or inferential allegations respecting all of the material elements necessary to sustain a recovery under some viable legal theory." *Herdrich v. Pegram,* 154 F.3d 362, 368 (7th Cir.1998). So too, a counterclaim must comply with the minimal pleading requirements of Rule 8(a). *See, Heller Financial, supra,* 883 F.2d at 1294 (defenses which "omitted any short and plain statement of facts and totally failed to allege the necessary elements of the alleged claims" insufficient).[10]

■■■ Finally plaintiff has moved to dismiss defendant's fifth counterclaim. This counterclaim seeks reformation of the contract and plaintiff has moved to dismiss solely on the grounds that since "the fraud claim fails, reformation is not available under a theory of fraud." (Rec.45, p. 7). That is essentially analytic but fails to take into consideration the possibility that a claim for reformation under Indiana law need not be grounded solely upon a finding of fraud.

■■■ "Reformation of a contract is appropriate only when both parties mistakenly execute a document which does not express the true terms of their agreement,

or when one party executes a contract buy the other party acts fraudulently or inequitably while having knowledge of the first party's mistake." *Fowler v. Campbell,* 612 N.E.2d 596, 602–3 (Ind.App.1993); *see also, Lake Monroe Regional Waste v. Waicukauski,* 501 N.E.2d 466, 470–71 (Ind.App.1986)("In Indiana, a trial court is permitted to reform written documents only in cases in which one party mistakenly executed a document which did not express the true terms of the agreement, and the other party has acted under the same mistake, or has acted fraudulently or inequitably while having knowledge of the other party's mistake."). Here, a fair reading of defendant's counterclaim is that plaintiff acted inequitably while having knowledge of defendant's mistake in the drafting of the documents. Since such a set of facts, if proved, could entitle defendant to relief under Indiana law, its claim for reformation will not be dismissed.[11]

This Court recognizes that some of the foregoing claims may be resurrected by the filing of an amended answer and counterclaims. As a general proposition, requests to amend are, under F.R. Civ. P. 15, "freely given when justice so requires" which, the Seventh Circuit reads as freely allowing amendment "in the absence of undue delay, undue prejudice to the party opposing the motion or futility of the amendment...". *Eastern Natural Gas Corp. v. Aluminum Company of America,* 126 F.3d 996, 999 (7th Cir.1997). Nevertheless, where a claim or defense is insufficient, even with the prospect of later amendment, dismissal is appropriate as a way "to expedite, not delay" a case by "removing unnecessary clutter from the case...". *Heller, supra* at 1294.

---

10. In fairness to the defendant, this Court recognizes that defendant relies on this Court's earlier decision in *Moffett v. Gene B. Glick Co., Inc.,* 604 F.Supp. 229, 233 (N.D.Ind.1984 ) for the proposition that failure to allege all the elements of a common law tort is not fatal to a complaint.

11. Given defendant's incorporation of its eighteen paragraphs from it first affirmative defense alleging fraud, it is understandable that plaintiff focuses on the theory that defendant's claim for reformation flows from the allegation of fraud. Perhaps this allegation could be more artfully pleaded on this score. However, it is sufficient as drafted, to place plaintiff on notice of the claim.

### Conclusion

On the basis of the foregoing, plaintiff/counterdefendant F. McConnell & Sons, Inc.'s (M & S) "Motion to Strike the First Affirmative Defenses of Defendant Target Data Systems, Inc." filed April 27, 1999 is GRANTED. Defendant's first affirmative defense is stricken. Plaintiff/counterdefendant's "Motion to Dismiss Portions of Defendant's Counterclaim" also filed on April 27, 1999 is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to defendant's third and fourth counterclaims and the same are hereby dismissed. The motion is denied with respect to defendant's fifth counterclaim.