William PAYTON, Plaintiff–Appellant,

v.

RUSH–PRESBYTERIAN–ST. LUKE'S MEDICAL CENTER, Rick Freeman, Anthony Murray and William Blair, Defendants–Appellees.

No. 98–2931.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1999.

Decided July 1, 1999.

Cathy A. Pilkington (argued), Chicago, IL, for Plaintiff–Appellant.

Phillip H. Snelling (argued), Johnson, Jones, Snelling & Gilbert, Chicago, IL, for Defendants–Appellees.

Before FLAUM, RIPPLE and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

William Payton appeals the district court's dismissal of his 42 U.S.C. § 1983 claims upon the defendants' 12(b)(6) motion, and its concurrent dismissal of his state law claims because it opted not to exercise supplemental jurisdiction over them. For the reasons set out below, we vacate the district court's decision, and remand for proceedings consistent with this opinion.

## Facts

Payton's § 1983 claims arise from a March 14, 1995 encounter with the individual defendants at Rush–Presbyterian–St. Luke's Medical Center ("Rush") in Chicago, Illinois. Payton alleges that on that date, he entered Rush in a peaceful, law-abiding manner. He claims that William Blair,[1] acting as Rush's agent, ordered his subordinates Rick Freeman and Anthony Murray, two Rush security personnel who were also "special Chicago police officers," ("special police officers") to stop him from entering Blair's office area.

The duties and powers of a special police officer are laid out in the Special Policeman and Security Guards Ordinance of the City of Chicago. ("SPSGO") § 4–340 Chi-

---

1. Blair was not named as a defendant in any of Payton's federal law claims. Thus, when this opinion refers to "the defendants" Blair is excluded, unless otherwise noted.

cago City Code (1993). This ordinance requires that a special police officer must be appointed and licensed by the city, § 4–340–020, and that the superintendent of police "shall cause an investigation to be made of the character of the applicant." § 4–340–040. The superintendent must keep a list of all persons appointed special officers. § 4–340–060. The SPSGO also requires that all officers wear a "suitable badge ... issued to him by the superintendent of police .... Said badge shall be worn by the special policeman on the outside of his outer coat while engaged in the performance of police duty." § 4–340–080. Finally, the regulation requires special officers to:

> conform to and be subject to all rules and regulations governing police officers of the city, and to such additional rules and regulations as the superintendent of police may make ... [they] shall possess the powers of the regular police patrol at the places for which they are respectively appointed or in the line of duty for which they are engaged. Special policemen shall report in person to the superintendent of police at such times and places as may be required by him.

§ 4–340–100.

The plaintiff's complaint alleged that on March 14, 1995 Freeman and Murray detained and arrested him, and beat, struck and kicked him without provocation. According to the complaint, these two knocked him to the ground, pushed his face to the floor, and, while they lay on top of him, handcuffed him. The alleged beatings caused the plaintiff to suffer severe injuries to his eyes, face, head, body, arms, legs and nervous system. The defendants pressed charges against Payton, although he was acquitted by a Cook County judge. The plaintiff claims that this was a malicious prosecution which led him to suffer emotional distress and other injuries.

Payton sued all of the defendants in Illinois court on a variety of state law claims. He later amended his complaint, alleging that the defendants violated his federal civil rights, because they were acting under the color of state law. This amended complaint contained three alleged federal law violations: a due process claim ("Count V"), an equal protection claim ("Count VI") and a claim alleging a conspiracy to violate Payton's constitutional rights ("Count VII"). These claims hinge on whether Freeman and Murray's status as special Chicago police officers made them state actors.

■ After Payton filed his § 1983 claims, the defendants removed the suit to federal district court.[2] Acting upon defendants' 12(b)(6) motion, the district court dismissed the plaintiff's federal claims. It held that Payton failed to meet a heightened pleading standard it felt was required when a plaintiff sues a private actor under § 1983. After throwing out the plaintiff's federal law claims, the district court declined to exercise supplemental jurisdiction over his state claims, and dismissed them without prejudice. The plaintiff now appeals.

### Analysis

■ We review the district court's decision to grant a defendant's 12(b)(6) motion to dismiss de novo. *Pickrel v. City of Springfield,* 45 F.3d 1115, 1118 (7th Cir. 1995). We affirm a dismissal only if we find that the plaintiff has failed to allege any set of facts upon which relief can be granted. *Id.*

### A.

Payton's second amended complaint alleged that when Freeman and Murray beat, detained, and arrested him, they did so under their authority as "duly appointed and anointed ... peace officers of the

---

**2.** This reference to "defendants" includes Blair, because absent unusual circumstances not present here, removal is only effective when all defendants consent. *Speciale v. Seybold,* 147 F.3d 612, 616 n. 4 (7th Cir.1998).

City of Chicago." The complaint also claimed that these defendants' actions were committed in their official capacities as special police officers, and thus under color of state law. Count V of the complaint states that through the use of these police powers, the defendants violated Payton's rights to be free from illegal arrest, unlawful restraint, use of excessive force and false imprisonment. Count VI claims that these powers were used to violate Payton's right to equal protection under the 14th Amendment, and Count VII alleges that the defendants conspired to violate the plaintiff's civil rights.

■ In rejecting Payton's argument that his pleadings were sufficient, the district court held that the plaintiff had to show some "additional plus factor" beyond the mere allegation that the defendants were special police officers. The district court believed that such a heightened pleading standard was "clearly established as a matter of law" by the Supreme Court's decision in *Williams v. United States*, 341 U.S. 97, 98–99, 71 S.Ct. 576, 95 L.Ed. 774 (1951); *see also Davis v. Carson Pirie Scott & Co.*, 530 F.Supp. 799, 803 (N.D.Ill.1982). The defendants urge this interpretation of *Williams* on us as well.

We start by noting that *Williams* itself announced no heightened pleading requirement. That case dealt with whether a special police officer could be criminally prosecuted under 18 U.S.C. § 242, a statute similar, but plainly not identical, to § 1983. *Williams'* central holding was that a private security guard granted special powers under a Florida statute could be prosecuted under federal civil rights law for beating a confession out of criminal suspects. 341 U.S. at 349, 71 S.Ct. 762. While the case mentions, among a litany of other facts, that the defendant flashed his city-issued badge while he beat his victim, the Supreme Court placed no special emphasis on this. However, the district court here elevated this single fact in *Williams* into a requirement that the plaintiff plead similar "plus factors" in order to survive a motion to dismiss.

We do not read such a mandate into *Williams.* Indeed, the defendants point to only one other case to support the district court's standard. *See Davis*, 530 F.Supp. 799, 802 (N.D.Ill.1982). Before *Davis*, no court ever found that *Williams* required plaintiffs to plead "plus factors." *Davis* relied solely on its own interpretation of *Williams*, and cited no additional precedent for its interpretation. Since *Davis*, no reported case has cited it—or *Williams*—for a similar proposition in the context of a motion to dismiss. Indeed, very recently, another court in the Northern District of Illinois analyzed a motion to dismiss a nearly identical claim to this one without reference to a heightened pleading standard. *Scott v. Northwestern University School of Law*, 1999 WL 134059 (N.D.Ill. March 8, 1999).[3]

This is not surprising given that *Davis* and the district court's opinion here are in tension with the federal notice pleading standard. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that a plaintiff plead a "short and plain statement of the claim showing that the pleader is entitled to relief." In the seminal case *Conley v. Gibson*, the Supreme Court held that the Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Plaintiffs need not "allege all, *or any* of the facts logically entailed by the claim.... A plaintiff does not

---

**3.** Numerous other district courts have also read almost exactly the opposite into *Williams. Stokes v. Northwestern Memorial Hospital*, 1989 WL 84584 (N.D.Ill. July 24, 1989) ("where the state delegates police powers to otherwise private actors who exercise these powers, the otherwise private actors subject themselves to liability for civil rights violations."); *see also Brooks v. Santiago*, 1993 WL 478393 (S.D.N.Y. Nov.15, 1993) (holding that according to *Williams*, pleading special police officer status satisfies 12(b)(6)); *Gipson v. Supermarkets General Corp.*, 564 F.Supp. 50, 55 (D.N.J.1983).

have to plead evidence .... [A] complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir.1998) (emphasis in original) (quoting *American Nurses' Assn. v. Illinois*, 783 F.2d 716, 727 (7th Cir.1986)).

FRCP Rule 9(b) embodies the exception to this otherwise lenient rule. Rule 9(b) requires that claims of fraud or mistake be pleaded with particularity. The higher standard in those cases is warranted by the "great harm to the reputation of a business firm or other enterprise" a fraud claim can do. *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir.1999). A plaintiff claiming fraud or mistake must do more pre-complaint investigation to assure that the claim is responsible and supported, "rather than defamatory and extortionate." *Id.*

Heightened pleading standards have fared poorly outside of the Rule 9(b) context. In a case relied on by the plaintiff, the Supreme Court unanimously held that federal courts may not apply a pleading standard "more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure in civil rights cases alleging municipal liability" under § 1983. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). *Leatherman* noted that "the Federal Rules ... address in Rule 9(b) the need for greater particularity in pleading certain actions, but do not include ... any reference to complaints alleging municipal liability under § 1983. *Expressio unius est exclusio alterius.*" *Id.* at 168, 113 S.Ct. 1160. The Court also noted that although additional heightened standards might be desirable, such a result "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Id.*

In the same vein, this circuit has expressed disfavor toward heightened pleading standards. In *Kyle v. Morton High*

*School,* we observed that "[b]efore *Leatherman,* on occasion we would apply a more stringent standard for notice pleading in civil rights cases; we no longer do so. We judge [a plaintiff's] complaint by the same standards we would apply in a non-civil rights case." 144 F.3d 448, 455 (7th Cir. 1998) (per curiam); *see also Sledd v. Lindsay,* 102 F.3d 282, 288–89 (7th Cir.1996); *Doherty v. City of Chicago,* 75 F.3d 318, 326 (7th Cir.1996); *Jackson v. Marion County,* 66 F.3d 151, 153 (7th Cir.1995).

■ The district court's holding that the plaintiff's pleading was necessarily inadequate because he failed to allege "plus factors" cannot be squared with *Leatherman* or this circuit's case law, and we do not adopt the standard used below. To the extent that *Davis* holds otherwise, we disapprove of it. Instead, we reiterate our rule that a pleading must only contain enough to "allow the court and the defendant[s] to understand the gravamen of the plaintiff's complaint." *Doherty,* 75 F.3d at 326. Analyzed under the proper standard, we conclude that the plaintiff's allegation that the defendants used their special police powers given to them by the City of Chicago to beat up, detain and arrest him is factually sufficient to meet Rule 8(a)(2)'s requirements.

**B.**

Payton has not yet cleared all of the hurdles he faces. Even though he has pleaded enough facts, he must show that as a legal proposition a special police officer can act under color of state law. The essence of a defendant's Rule 12(b)(6) motion is not that the plaintiff has pleaded insufficient facts, it is that even assuming all of his facts are accurate, he has no legal claim. *Johnson v. Revenue Management Corp.,* 169 F.3d 1057, 1059 (7th Cir.1999).

■ Section 1983 provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the

United States ... to the deprivation of any rights, privileges, *or immunities secured* by the Constitution and law, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. Although it is usually used only against government officers because of its requirement that the defendant act "under color of state law," § 1983 may also be brought to bear on private individuals who exercise government power. Erwin Chemerinsky, *Federal Jurisdiction*, 464–65 (3rd ed.1999). The Supreme Court has left open the question of whether private police officers can be held liable as state actors under § 1983. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). We have also previously demurred from directly answering this question. *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 n. 1 (7th Cir.1982). However, under relevant Seventh Circuit precedent, privately employed railroad police have been deemed state actors. *United States v. Hoffman*, 498 F.2d 879, 881–82 (7th Cir. 1974). In well-reasoned opinions, district courts in this circuit have held that private hospital security guards and university policemen also can be state actors. *See Scott v. Northwestern University School of Law*, 1999 WL 134059 at *3–4 (N.D.Ill. March 8, 1999); *Stokes v. Northwestern Memorial Hospital*, 1989 WL 84584 at *3–4. (N.D.Ill. July 24, 1989). On the other hand, this court has held that a private mall security force was not a state actor, because the guards exercised no "police powers." *United States v. Shahid*, 117 F.3d 322, 324 (7th Cir.1997). We have also held on summary judgment and after extensive fact finding that a private security guard operating under a contract with the Chicago Housing Authority was not a state actor. *Wade v. Byles*, 83 F.3d 902, 906 (7th Cir.1996). The present case falls closer to *Hoffman* than *Shahid* or *Wade*.

There are two circumstances in which a private party will be held responsible as a state actor. *Wade*, 83 F.3d at 905. The first is where the state effectively directs or controls the actions of the private party such that the state can be held responsible for the private party's decision. *Id.* Payton does not make that claim here, although under the Chicago special police officer statute it is a possibility. *See* SPSGO § 4–340–030 (giving superintendent of police· the power to appoint special policemen to "do special duty at any fixed place in the city, or at any place necessary for protection of persons, passengers and property") and § 4–340–100 (special policemen shall report in person to the superintendent "at such times and places as may be required by him."). The second situation is when the state delegates a public function to a private entity. *Wade*, 83 F.3d at 904, *citing Blum v. Yaretsky*, 457 U.S. 991, 1005, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Payton proceeds under this theory, arguing that the Chicago ordinance delegates a public function (police protection) to a private entity (the special police officers).

In *Hoffman*, which was a criminal case but is still instructive, this court held that the defendants, who were both privately employed railroad policemen and Chicago special police officers (under a predecessor statute), had acted under color of state law when they brutally beat vagrant trespassers. 498 F.2d at 880. *Hoffman* noted that the defendants were granted all of the same powers and duties as regular city police officers by the relevant authorizing legislation. *Id.* ("The acts charged occurred while [the defendants] were on duty ... while possessing the same powers as city police."). Of particular importance to the court's determination was the fact that the defendants were acting under a "continuing delegation of police power .... [They were] authorized on a continuing and full-time basis to search actively for criminals and trespassers and to use the powers of the state when their search is successful." *Id.*

If *Hoffman* had held that this authority flowed directly from the defendants' status as Chicago special police officers, we might

find it dispositive. However, the court primarily (and perhaps exclusively) relied on the defendants' designation as railroad police officers. *Id.* Railroad officers had previously been clearly defined as state actors. *See United States v. Belcher,* 448 F.2d 494, 497 (7th Cir.1971). Nevertheless, *Hoffman* weighs heavily in the plaintiff's favor, because the defendants here appear to have roughly the same power as railroad police. *See also Henderson v. Fisher,* 631 F.2d 1115, 1117–18 (3rd Cir. 1980) (per curiam) (campus security officers delegated the "same powers which the municipal police force of Pittsburgh possesses" save for stricter geographic restrictions were state actors); *Scott v. Northwestern University School of Law,* 1999 WL 134059 at *3–4 (N.D.Ill. March 8, 1999) (state statute granting university police "the powers of municipal peace officers ... including the power to make arrests for violations of state statutes, municipal or county ordinances" with geographic limitations placed defendants' actions within ambit of color of state law).

Also persuasive is *Stokes v. Northwestern Memorial Hospital,* which held that special police officers acting under a previous version of this exact ordinance could be acting under color of state law for 12(b)(6) purposes. 1989 WL 84584 at *3–4. (N.D.Ill. July 24, 1989). *Stokes* found particularly significant that the predecessor ordinance (like this one) gave special officers the power to arrest anyone they wished. *Id.* Another court came to the same conclusion, emphasizing the fact that the predecessor ordinance gave special police officers the "powers of the regular police patrol." *Gill v. Unibanctrust,* 1985 WL 3513 at *2 (N.D.Ill. October 31, 1985). Other courts to consider this issue have reached similar conclusions to *Stokes* and *Unibanctrust. See Rojas v. Alexander's Dep't Store, Inc.,* 654 F.Supp. 856 (E.D.N.Y.1986), which held that a "special patrolman" appointed pursuant to a New York City ordinance nearly identical to Chicago's was subject to § 1983 liability. *Id.* at 858; *see also Thompson v. McCoy,* 425 F.Supp. 407, 410 (D.S.C.1976). Underlying all of these cases is the notion that if the state cloaks private individuals with virtually the same power as public police officers, and the private actors allegedly abuse that power to violate a plaintiff's civil rights, that plaintiff's ability to claim relief under § 1983 should be unaffected.[4]

The defendants point to *Wade v. Byles* to support their position that Freeman and Murray were not state actors. 83 F.3d 902 (7th Cir.1996). In *Wade,* the plaintiff was shot in the groin by a private security guard who was working under a contract with the Chicago Housing Authority ("CHA"). *Id.* We noted that the mere fact that the defendant was working under the auspices of the CHA and was performing a function that served the public did not transform a private security guard into a state actor. *Id.* at 905. Instead, we focused on the specific powers that the defendant exercised under his employer's contract with the CHA. Those powers allowed the defendant to carry a handgun, arrest people for criminal trespass pending the arrival of the police, and use deadly force in self-defense. *Id.* We noted that none of these powers had been exclusively reserved to the police—citizen's arrests and the rights to carry handguns and use them in self-defense are available to individuals outside of the law enforcement community. *Id.* at 906. (citations omitted). Moreover, the area in which the defendant was authorized to act was strictly circumscribed—he could only perform his responsibilities in the lobby of CHA properties. *Id.* Even the plaintiff conceded that the defendant had no more powers than the average armed security guard. *Id.* Because of the limitations on the defendant,

4. In *Hoffman*—a criminal case—this notion manifested itself through punishment of a private police officer who abused his state-given power under laws usually reserved for public employees.

we concluded that he was not a state actor. *Id.*

■ While there is superficial resemblance between *Wade* and this case, the differences are more instructive than the similarities. There are two crucial distinctions between the powers of the defendant in *Wade* and those involved here. First, as noted above, the guard in *Wade* was limited to using his powers in the lobbies of CHA buildings. *Id.* Second, he was only empowered to arrest people for criminal trespass pending the arrival of the police. *Id.* These limits underscore that CHA security guards were no substitute for the police. If a crime occurred in a resident's apartment or a stairwell, the security guards presumably would have had to call the police. Likewise, if they witnessed a crime other than criminal trespass—drug dealing, for example—it appears that the guards' only recourse would have been to dial 911. *See id.* (contract security guards not part of separate CHA police force "entrusted with all 'powers possessed by the police of cities, and sheriffs,'" and thus could not participate in searches of residential units.) (citation omitted). This is a far cry from delegating "all of the powers of the regular police patrol" to the special police officers, as allegedly occurred here. SPSGO § 4–340–100.[5]

This grant of power in § 4–340–100 is especially significant in conjunction with the fact that special police officers must "conform to and be subject to all the rules and regulations governing police officers of the city." *Id.* The broad powers and responsibilities of Freeman and Murray here are similar to those given to the defendants in *Hoffman, Scott, Stokes,* and the other cases discussed above, and are in sharp distinction to the limited power possessed by the defendant in *Wade.* As Payton argues, this ordinance delegates police powers otherwise exclusively reserved to the state, thus making those who act pursuant to it potentially liable under § 1983. In effect, for pleading purposes the SPSGO made Freeman and Murray the de facto police on Rush's premises. We conclude that for purposes of determining whether Freeman and Murray could be state actors in this case, no legal difference exists between a privately employed special officer with full police powers and a regular Chicago police officer.

## C.

The defendants contend that even if Freeman and Murray were state actors under § 1983, Payton's federal claims should be dismissed because those two defendants are entitled to qualified immunity from suit. Because the district court dismissed all of the plaintiff's claims based on the erroneous heightened pleading requirement, neither this, nor any of the defendants' other arguments were reached below.

The defendants note that in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that government officials performing discretionary functions (such as making arrests) are immune from damages so long as their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known" when he or she acted. *Id.* at 818, 102 S.Ct. 2727. They argue that it was not clearly established on March 14, 1995 (the day of the alleged assault) that

5. For the same reason, the defendants' reliance on *Klimzak v. City of Chicago,* 539 F.Supp. 221 (N.D.Ill.1982), is misplaced. There, the plaintiff alleged that supermarket security guards ·were acting under color of state law when they stopped and held him against his will. *Id.* at 222. The district court dismissed the suit because the limited power the guards had did not transform them into state actors. *Id.* at 223. In particular, the defendants there could only ask an alleged shoplifter for identification, inquire into whether a crime was committed, and detain the person pending the arrival of a peace officer. *Id.* at 223 n. 2. Because *Klimzak* involves even less power than was ceded to the guard in *Wade,* it too is distinguishable from this case.

Freeman and Murray were state actors, and thus they should be free from liability.

Whatever the merits of this claim, they cannot be reached until an important predicate question is answered. On remand the parties must address, and the district court must decide, whether in light of *Richardson v. McKnight* these defendants may assert qualified immunity. 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). *Richardson* held that a correctional officer working for a private contractor engaged by Tennessee to manage its prisons was not entitled to claim qualified immunity; *see also Malinowski v. DeLuca*, 177 F.3d 623, 624 (7th Cir.1999) (holding that privately employed building inspectors were not entitled to claim qualified immunity under *Richardson*).

The *Richardson* Court's rationale was twofold. First, there was no "conclusive evidence of a history of immunity for private parties carrying out [prison] functions." *Richardson*, 117 S.Ct. at 2104–105. Second, the Court found that the public policy purposes underlying governmental immunity—such as preventing overly timid job performance and making sure that talented candidates are not discouraged from entering public service because of fear of being sued—did not justify allowing the private prison guard to claim immunity. *Id.* at 2106–07; *see also Wyatt v. Cole*, 504 U.S. 158, 168–69, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (private actor who conspired with police to abuse power of replevin was amenable to suit under § 1983 but could not claim immunity). Private parties have market incentives—in particular competition—which alleviate concerns about overly timorous government offi-

cials. *Richardson*, 117 S.Ct. at 2106; *Malinowski*, 177 F.3d at 626.

If the defendants raise the qualified immunity defense on remand, the parties are directed to brief the factors the *Richardson* Court used in its inquiry—whether a history of immunity for private actors exists, and the public policy considerations—to answer whether or not an assertion of immunity may stand; *see also Malinowski*, 177 F.3d at 626–627 (court examined "historical origins" of immunity and public policy in determining that privately employed building inspector could not invoke qualified immunity). We note that *Richardson's* scope is not fully defined, and by remanding do not suggest that the defendants' assertion of qualified immunity is certain, or even likely, to fail. The Supreme Court specifically noted a "caveat" to applying its opinion. 117 S.Ct. at 2107. It observed that it had "answered the immunity question narrowly, in the context in which it arose." *Id.* That context was "one in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution), with limited direct supervision by the government, [undertook] that task for profit and potentially in competition with other firms." *Id.* To the extent that these defendants may or may not share some of those characteristics, we believe this "caveat" is highly relevant.

### D.

■ The defendants contend that even if state action exists and they are not entitled to qualified immunity, Count VI of Payton's amended complaint should be dismissed because he has not alleged any facts stating an equal protection violation.[6]

**6.** The defendants make another argument which was raised, but not reached below. They claim that Rush and Blair are improperly named as defendants in Count VI, because § 1983 liability cannot be imposed under the theory of *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir.1997). As plaintiff

notes, Count VI does not mention Blair. As to Rush, plaintiff's argument is not for respondeat superior liability. Instead, his claim is that Rush had a policy and practice of allowing its special police officers to stop, harass, detain, arrest and use undue and excessive force on citizens without probable cause to believe a crime had been committed. Although the claim against Rush has an uncertain chance of survival at summary judg-

We have held that "to state an equal protection claim, a § 1983 plaintiff must aver that a state actor purposefully discriminated against him because of his identification with a particular (presumably disadvantaged) group." *Sherwin Manor Nursing Ctr., Inc. v. McAuliffe,* 37 F.3d 1216, 1220 (7th Cir.1994); *see Albiero v. City of Kankakee,* 122 F.3d 417, 421 (7th Cir.1997) (even construing 12(b)(6) under the most lax standards, plaintiff must explain basis for equal protection violation, such as race).[7] Count VI, titled "Violations of Payton's Constitutional Rights to Equal Protection of Law" makes no suggestion that he was discriminated against due to his membership in a particular class. Nothing in any of his other claims provides sufficient detail to make up for this deficiency.

Accordingly, Count VI fails to state a claim upon which relief can be granted, although we leave it to the discretion of the district court to allow the plaintiff to amend his complaint on remand because the district court has not previously addressed this issue.

### E.

■ Finally, the defendants posit that Payton's Count VII, which alleges a conspiracy to violate his civil rights, should also be dismissed under Rule 12(b)(6).[8] As in Count VI, the plaintiff has failed to allege that there was some racially (or otherwise discriminatorily) motivated animus behind the defendants' actions. In a § 1985 case, such an omission dooms a plaintiff's claim. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *Bowman v. City of Franklin,* 980 F.2d 1104, 1109 (7th Cir.1992). If there were no other defects in the plaintiff's pleading, we would treat this claim the same as we did Count VI, and leave it to the district court's discretion as to whether the plaintiff should be permitted to amend his complaint.

■ However, a more serious flaw exists in Count VII—namely that under the intracorporate conspiracy doctrine a conspiracy cannot exist solely between members of the same entity. *Wright v. Illinois Dept. of Children & Family Services,* 40 F.3d 1492, 1508 (7th Cir.1994). As we held in *Wright,* "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory." *Id.* (citations omitted); *see also Hartman v. Board of Trustees of Community College,* 4 F.3d 465, 470 (7th Cir.1993); *Doe v. Board of Education of Hononegah School Dist.,* 833 F.Supp. 1366, 1381 (N.D.Ill. 1993).

ment, accepting it as true as we must at this stage, it is clear that the plaintiff is not pleading respondeat superior liability for Rush.

7. Neither this case nor *Sherwin* or *Albiero* foreclose the "class of one" line of cases permitting a plaintiff who the government has treated arbitrarily in comparison to someone else identically situated to state an equal protection claim, even though the plaintiff makes no mention of discrimination on a racial or otherwise prohibited basis. *See Indiana State Teachers Ass'n v. Board of School Commrs.,* 101 F.3d 1179, 1181 (7th Cir.1996); *Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir.1995) (plaintiff applying for liquor license subjected to unequal treatment alleged to have been the result "solely of a vindictive campaign" by government official with "malignant animosi-

ty" toward him stated an equal protection claim.); *Ciechon v. City of Chicago,* 686 F.2d 511 (7th Cir.1982). We note that these "class of one" claims only "provide a last-ditch protection against governmental action wholly impossible to relate to legitimate governmental objectives," *Esmail,* 53 F.3d at 180, and that "equal protection is trivialized when it is used to subject every decision made by state or local government to constitutional review by federal courts." *Indiana Teachers,* 101 F.3d at 1181.

Payton has not raised a "class of one" claim here, nor does his case appear similar to either *Esmail* or *Ciechon.*

8. This claim actually arises under 42 U.S.C. § 1985, rather than § 1983.

Although *Wright* focused on corporate managers, nothing in its reasoning precludes us from applying it to supervisors and subordinates, so long as all are working in the corporation's (or governmental entity) interest. While exceptions exist to the intracorporate conspiracy limitation in "egregious circumstances," *see Hartman v. Board of Trustees of Community College*, 4 F.3d 465, 471 (7th Cir. 1993),[9] the plaintiff failed to even respond to this argument, much less point to a putatively "egregious circumstance." Thus, we conclude that Count VII of Payton's complaint clearly fails to state a claim upon which relief can be granted, and should be dismissed.

## Conclusion

For the reasons set out above, we VACATE the district court's dismissal of the plaintiff's claim under Rule 12(b)(6), and REMAND this cause for further proceedings consistent with this opinion.[10]

RIPPLE, Circuit Judge, concurring.

Crucial to the court's holding today is the procedural posture of the case. In deciding a motion to dismiss for failure to state a claim upon which relief can be granted, the district court may grant the motion only when the allegations of the complaint will not support relief "under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

Here, the court concludes that "for pleading purposes," *ante* at 630, we must assume that the Ordinance made the defendants the de facto police on Rush's premises. A charitable reading of the complaint permits that interpretation. I do not understand the court to hold, however, that, under all circumstances, the actions of a private security guard who has been appointed a special officer under the Chicago Ordinance can be considered "state action." Such a result would stretch impermissibly the relevant precedent of the Supreme Court and of this court. It would also require a very expansive reading of the Chicago Ordinance.

Placing aside the infrequently encountered symbiotic relationship test of *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 723–25, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), *see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 621, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the acts of an individual can be characterized as state action when the government delegates to a private individual a function that is "traditionally the exclusive prerogative of the State," *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), or when the state effectively directs, commands or encourages the actions of a private party. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 166, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). In this case, no party suggests, nor do my colleagues, that this latter criterion affords any basis for characterizing the defendants' actions as "state action." Although the Chicago Ordinance makes clear that the City of Chicago has regulated the occupation of a private security guard through its Ordinance, the statute does not attempt to command or encourage the actions that, it is alleged, the defendant security guards took here. We therefore must determine whether, under the public function doctrine, the allegations of the complaint, read in light of the Ordinance, present the possibility that the plaintiff may be able to present facts that will warrant judgment in his favor.

9. The "egregious circumstances" exception in *Hartman* refers not to the act of discrimination complained of, but instead where corporate employees "are shown to have been motivated solely by personal [rather than corporate] bias." *Id.* at 470.

10. Pending the outcome of any further proceedings on qualified immunity below, the state law claims which plaintiff sought to try in federal court under supplemental jurisdiction should be reinstated. *See Armstrong v. Squadrito*, 152 F.3d 564, 582 (7th Cir.1998).

Turning to the text of the Ordinance, its regulatory purpose is immediately apparent. It defines "special policeman" to mean any person who guards, "for hire or reward, ... any building, structure, premises, person or property within the city" unless that individual is a police officer, sheriff or deputy sheriff. Ordinance § 4–340–010. With one exception not relevant here, the Ordinance further requires that any person engaging in the occupation of special policeman as defined by the Ordinance must first be appointed and obtain a license from the City. *See* Ordinance § 4–340–020. In a later section of extraordinary breadth and significant ambiguity, the Ordinance sets forth the powers and duties of a special policeman:

> Every special policeman shall conform to and be subject to all the rules and regulations governing police officers of the city, and to such additional rules and regulations as the superintendent of police may make concerning special policemen. Special policemen shall possess the powers of the regular police patrol at the places for which they are respectively appointed or in the line of duty for which they are engaged.

> Special policemen shall report in person to the superintendent of police at such times and places as may be required by him.

Ordinance § 4–340–100. Although I do not think that the matter is entirely free from doubt and would have much preferred the participation of the City in this appeal as amicus, I must agree with my colleagues that the Ordinance is susceptible to the broad reading they give it. Despite the obvious preoccupation of the bulk of the Ordinance with regulation of the occupation, it nevertheless appears that the City intended to allow all persons hired to guard any person or property in the City to have the same authority, at least at their place of employment, as a sworn Chicago police officer. I do not understand the court to hold, however, that every action taken by every security guard in the City of Chicago during the course of his employment amounts to "state action." There is a significant difference between having authority and exercising that authority. Our focus must be on the "function performed." *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). At this stage of the litigation, we must assume that the defendant guards were exercising the full range of police power delegated to them by the City of Chicago. Further development of the record might well establish, however, that the guards' responsibilities were significantly circumscribed by their employer and that they performed well-defined functions quite narrow in scope—duties that cannot be considered an integral aspect of the exercise of a function that has been traditionally the exclusive prerogative of the state. *See Wade v. Byles*, 83 F.3d 902, 905–06 (7th Cir.1996).

On this understanding, I join the judgment and the opinion of the court.