DAVIS, Circuit Judge,
dissenting in part and concurring in the judgment in part:
Officers Costa and Slader, uniformed, armed security officers clothed with broad law enforcement authority by, and subject to pervasive regulation under, Virginia law, detained Appellee Mario Day at gunpoint, handcuffed him, searched his car and his person, and interrogated him, and thereby collected critical evidence for the *690 government in its prosecution of Day. The majority expansively concludes, nevertheless, that the officers’ actions were not “fairly attributable” to the Commonwealth. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001); id. at 312, 121 S.Ct. 924 (Thomas, J., dissenting). Consequently, the majority concludes that the constraints imposed by the federal constitution on governmental investigations of criminal activity had no application in this case. I respectfully dissent from this holding.
Under the facts and circumstances shown on this record, when Officer Costa retrieved the marijuana from Day’s pants pocket, J.A. 22, and when he questioned the handcuffed Day about Day’s possession of the handgun while they awaited the arrival of a local law enforcement officer to take custody of Day, id., Officer Costa was engaged in traditional law enforcement activity plainly intended, as a matter of law, to aid in the prosecution of Day for criminal offenses. Officer Costa’s actions were made possible by and legitimized by Virginia law; no private citizen could have achieved what he did on behalf of the government under the circumstances presented here.
Accordingly, Officer Costa’s interrogation of Day regarding the latter’s possession of “anything illegal,” his subsequent search of Day’s pants pocket and seizure of the marijuana, and his later questioning regarding Day’s possession of the handgun, are all subject to scrutiny under prevailing constitutional standards, every bit as much as they would be if Officer Costa was a sworn governmental law enforcement officer.
I am persuaded that, tested by those constitutional standards, Day’s admission that he possessed marijuana was the product of neither an unreasonable seizure of his person nor of custodial interrogation, and that the subsequent seizure of the marijuana was reasonable under the Fourth Amendment. By the time that Officer Costa questioned Day regarding the handgun, however, Day’s detention had ripened into an arrest. Accordingly, the handgun inquiry constituted an unwarned custodial interrogation, contravening the mandate of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, I would reverse the district court’s suppression of the marijuana and Day’s admission that he possessed it, but affirm the district court’s suppression of Day’s statements to Costa regarding the handgun.
I.
The Supreme Court has never considered whether or under what circumstances “state action” inheres in the exercise of traditional police functions by state-authorized and regulated armed security guards. Cf. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 163 n. 14, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); Romanski v. Detroit Entertainment, L.L.C., 428 F.3d 629, 636 (6th Cir.2005) (“The Supreme Court has explicitly declined to decide the question of whether and under what circumstances private police officers may be said to perform a public funetion[.]”).
The appropriate test for determining whether Officers Costa and Slader should be deemed state actors under the circumstances shown here, and therefore whether well-settled, constitutionally-rooted constraints on criminal investigations apply, is the public function test. Under this test, a private actor is deemed a state actor if the function performed is traditionally the exclusive prerogative of the State. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Goldstein v. Chestnut Ridge Volunteer *691 Fire Co., 218 F.3d 337, 342 (4th Cir.2000) (citing United Auto Workers v. Gaston Festivals, Inc., 43 F.3d 902, 906 (4th Cir.1995)). That public function must be “traditionally exclusively reserved to the State.” Jackson v. Metro. Edison Co., 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); see Flagg Bros., 436 U.S. at 157, 98 S.Ct. 1729.
As the Supreme Court has suggested, “police protection” is among those functions “which have been administered with a great[] degree of exclusivity by States and municipalities])]” Flagg Bros., 436 U.S. at 163, 98 S.Ct. 1729. This court has echoed the Supreme Court’s recognition, noting that “the police function is ‘one of the basic functions of government,’ [and] a ‘most fundamental obligation of government to its constituency.’ ” Rodriguez v. Smithfield Packing Co., Inc., 338 F.3d 348, 355 (4th Cir.2003) (citing Foley v. Connelie, 435 U.S. 291, 297, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978)). “It would be hard to imagine, in other words, a more prototypically representative government function than [a private security guard’s] use of his official capacity to effectuate [an] arrest.” Id.
Our sister circuits apply a totality of the circumstances test to determine whether private security guards should be treated as state actors, paying special attention to the arrest powers granted to private security guards and the extent to which the guards are licensed by and regulated by the state. E.g., Romanski, 428 F.3d at 640; Payton v. Rush-Presbyterian-St. Luke’s Medical Ctr., 184 F.3d 623, 630 (7th Cir.1999).
In Romanski the court held that private security officers licensed by the state and having plenary arrest powers (although those arrest powers only applied when the guards were on duty and on their employer’s property) were properly deemed to act “under color of law” in a suit brought pursuant to 42 U.S.C. § 1983. 428 F.3d at 640.[1] There, a private security guard at a casino detained and interrogated a patron suspected of stealing a token and the patron sued, alleging Fourth Amendment violations. The district court held that the casino employee was a state actor as a matter of law because she possessed the same arresting authority enjoyed by the police. Id. at 634-35.
On appeal, the Sixth Circuit affirmed. Id. at 636. As cited by the district court here, the Sixth Circuit held that “where private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test[,]” id. at 637, and found that the casino guard had sufficient authority to qualify as a de facto police officer. The guard was also licensed and vetted by Michigan’s department of state police. By statute, the guard had “the authority to arrest a person without a warrant as set forth for public peace officers....” Id. (citing Mich. Comp. Laws § 338.1080). Thus, the Romanski standard looks to whether a private security guard is licensed by the state and has “plenary police powers.” Cf. Lindsey v. Detroit Entertainment, LLC, 484 F.3d 824, 830 (6th Cir.2007) (holding that casino security guards who were not licensed by the state were not state actors).
*692 The Seventh Circuit applied a similar test in reversing the grant of a motion to dismiss a § 1983 claim. Payton, 184 F.3d at 630. In Payton, the plaintiff brought a § 1983 claim based on his allegation that two hospital security guards detained, arrested, beat, struck, and kicked him without provocation. Id. at 625. The district court granted the guards’ motion to dismiss on the basis that they did not act under color of law. Id. Plaintiff appealed and the Seventh Circuit reversed and remanded, holding that the guards could be deemed to act under color of law because they had plenary arrest power and were subject to the same rules as police officers. Id. at 628. The court noted that, under the applicable law, the private guards possessed “all of the powers of the regular police patrol”; and therefore, that they must “conform to and be subject to all the rules and regulations governing police officers of the city.” Id. at 630; see also Henderson v. Fisher, 631 F.2d 1115, 1119 (3rd Cir.1980) (holding that university security guards with plenary arrest powers on campus are state actors for the purposes of § 1983 claims); cf. Wade v. Byles, 83 F.3d 902, 906 (7th Cir.1996) (holding that a private security guard is not a public actor when he lacks plenary arrest authority and can only arrest people for criminal trespass pending the arrival of the police).
Under these persuasive precedents, when private security guards have “plenary police powers,” Romanski, 428 F.3d at 637, and are licensed and heavily regulated by the state, they may be deemed public actors. Courts do not withhold state actor status based on whether a guard’s arrest powers are limited to a specific geographical area. See Payton, 184 F.3d at 629-30 (arrest powers limited to hospital grounds); Romanski, 428 F.3d at 639-40 (arrest powers limited to casino grounds). Instead, the courts examine the scope of authority granted by the state to the officers and evaluate the extent of the regulation imposed by the state. Where guards have limited powers, e.g., Wade, 83 F.3d at 905-06; Johnson v. LaRabida Children’s Hospital, 372 F.3d 894, 897 (7th Cir.2004), they are not deemed public actors. When guards enjoy “plenary police powers,” however, they may, depending on the circumstances presented, assume the obligations of a state actor.
Properly viewed, then, in an appropriate case, private armed security guards in Virginia may be treated as public actors. This is in part because they have generous arrest authority. The guards may effectuate an arrest for any offense occurring in their presence while on the premises they guard, and even for some (primarily shoplifting-related) offenses not occurring in their presence. Va.Code Ann. § 9.1-146.[2] Under the statute, there are even circumstances when the law requires that private security guards be deemed “arresting officers.” Id. In fact, few differences exist in the scope of arrest authority between a private security guard and a state officer. Both may arrest for any crime committed in their presence, and for some misdemeanor crimes committed outside their presence. An additional power vested in the police is that they may arrest individuals for more numerous crimes committed outside of their presence. But of course, police officers themselves are limited to making arrests for crimes committed out *693 side their presence to situations where they have “reasonable grounds or probable cause to suspect of having committed a felony not in his presence.” Va.Code Ann. § 19.2-81. This difference in arrest power is sufficiently insignificant to declare that Virginia guards possess authority akin to plenary authority.[3] See Romanski, 428 F.3d at 638 n. 3 (defining plenary police powers as state-conferred authority, “while on her employer’s property during her working hours,” to “make warrantless arrests to the same extent as a public police officer”). Manifestly, the power to arrest confers the power to search in a wide range of circumstances. See Chimel v. California, 395 U.S. 752, 759, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Such authority was precisely that exercised by Officer Costa in this case.
Private security guards are also subject to a high level of government regulation. See Va.Code Ann. § 9.1-138 et seq. As the court below explained, and the majority opinion notes, private security guards are “vetted, trained, and continue to be subject to disciplinary action under the aegis of the state’s Criminal Justice Services Board.” Maj. Op. at 684; Day, 590 F.Supp.2d at 801. Additionally, Virginia regulations require armed security officers to obtain a “valid registration” by satisfying “compulsory minimum training standards established by the Board” and submitting to a “state and national fingerprint search.” Day, 590 F.Supp.2d at 800 (discussing Va.Code Ann. § 9.1-139). Virginia also employs the Criminal Justice Services Board to “[rjeceive complaints concerning the conduct of [an armed security officer], to conduct investigations, and to take appropriate disciplinary action if warranted.” Maj. Op. at 684 (discussing Va.Code Ann. § 9.1-141). In short, Virginia has a comprehensive regulatory scheme for its private security guards.
Because under Virginia law armed security guards are subject to extensive government regulation and enjoy extensive police powers, and because Officers Costa and Slader actually exercised those powers in this case, I would affirm the district court’s order insofar as it deemed the private security guards in this case public actors in connection with their apprehension of Day, and I would require them to adhere to the same constitutionally-rooted constraints as ordinary police officers. This conclusion finds ample support among the courts of appeals.[4]
II.
The majority, instead of applying a public function test tailored to armed private security guards, relies on a test intended to aid in the assessment of the activities of private individuals who become police in *694 formants and who mine information and report or deliver it to law enforcement. That test, the Jarrett/Ellyson test, inquires whether the government knew of and acquiesced in the private individual’s challenged conduct, and whether the private individual intended to assist law enforcement or had some other independent motivation. Maj. Op. at 683-84. But that test is inapplicable here for at least two reasons.[5] First, it was derived from a very different factual context and should not be remolded to control these facts. United States v. Jarrett, 338 F.3d 339, 344-46 (4th Cir.2003) (determining that an anonymous computer hacker was not acting as a Government agent when he procured child pornography files from defendant’s computer and delivered via email to law enforcement); United States v. Ellyson, 326 F.3d 522, 527-28 (4th Cir.2003) (determining that defendant’s live-in girlfriend did not act as government agent when she located child pornography in their shared residence and turned it over to police because she acted of her own accord and not under the direction of the police).
Second, the majority misses the forest for the trees. The appropriate analysis requires an evaluation of the totality of the circumstances. Jarrett and Ellyson provide two illustrative examples of that test, but they should not be read to supplant the test itself. In fact, this court “has articulated a number of different factors or tests in different contexts,” for the public function test and the facts “which would convert the private party into a state actor [vary] with the circumstances of the case.” Goldstein, 218 F.3d at 342-43 (citing Lugar, 457 U.S. at 937, 102 S.Ct. 2744).
I would limit application of the Jarrett/Ellyson test to cases involving private persons acting as police informants, a methodology supported by the analysis in the cases themselves. In both cases, this court explicitly eschewed a formalistic test, instead noting that the analysis is fact-intensive, Ellyson, 326 F.3d at 527, and “can only be resolved in light of all of the circumstances.” Jarrett, 338 F.3d at 344 (quoting Skinner v. Railway Labor Executives’ Ass'n, 489 U.S. 602, 614-15, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)).
Thus, Jarrett and Ellyson provide a useful framework for analyzing government informants under the public function test. But those two cases do not transform the general inquiry into a strict two-factor analysis. The overarching issue remains whether the conduct of the private actors is fairly attributed to the state. Brentwood Academy, 531 U.S. at 295, 121 S.Ct. 924. In Jarrett and Ellyson, this court *695 focused on the two aspects of the totality of the circumstances, factors that were particularly relevant as to government informants acting without governmental supervision.
But the appropriate test for this case must focus on the particularities of armed private security guards, their authority and the manner in which they exercise that authority, a fundamentally different scenario than that presented with regard to government informants, and one dis-
cussed only in persuasive precedent from our sister circuits. Private security guards have arrest authority and are subject to significant governmental regulation, two factors completely absent from the analysis for government informants.[6] Accordingly, instead of following a test created for a distinguishable set of facts, I prefer a specific fact-based inquiry targeted at the authority granted by statute to, and its exercise by, armed private security guards, similar to the test used in Sixth and Seventh Circuits.
*696 III.
As explained above, I would conclude that Day satisfied his burden of establishing that the armed private security guards who detained and searched him must be deemed state actors. Turning, then, to the merits of the district court’s suppression order, I conclude that the district court (1) erred when it suppressed Day’s statement about the marijuana and when it suppressed the physical evidence itself, but (2) did not err in suppressing Day’s statement regarding his possession of the handgun.[7]
A.
Officer Costa did not violate Day’s Miranda rights when he asked him “if he had anything illegal on him[,]” J.A. 22, because the question was not part of a custodial interrogation. Law enforcement officers making an arrest must give Miranda warnings before conducting custodial interrogations. Miranda, 384 U.S. at 444, 86 S.Ct. 1602. Custodial interrogation is “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Id. But Miranda warnings are unnecessary before questioning a suspect during a Terry stop. United States v. Leshuk, 65 F.3d 1105, 1108-09 (4th Cir.1995). Here, Cos-ta’s question (put to Day in the initial moments of the latter’s detention by the former) was merely intended to safeguard the situation during a Terry stop.
An individual is in custody “when, under the totality of the circumstances, a suspect’s freedom from action is curtailed to a ‘degree associated with formal arrest.’ ” U.S. v. Colonna, 511 F.3d 431, 435 (4th Cir.2007) (quoting Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). The operative question is whether, viewed objectively, a reasonable man in the suspect’s position would have understood that he was in custody. Berkemer, 468 U.S. at 422, 104 S.Ct. 3138. Among the facts to be considered are “the time, place and purpose of the encounter, the words used by the officer, the officer’s tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.” United States v. Weaver, 282 F.3d 302, 312 (4th Cir.2002).
In this circuit, an officer’s use of a drawn weapon and/or handcuffs does not necessarily transform a Terry stop into an arrest. Further, even a complete restriction of liberty is valid under Terry if the restriction is brief. United States v. Sinclair, 983 F.2d 598, 602 (4th Cir.1993) (holding that drug dealers were not in custody merely because law enforcement officers drew their guns during a Terry stop as a reasonable safety precaution); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir.1989) (holding that a stop and frisk is not necessarily converted into an arrest when defendant was handcuffed pri- or to the pat down search).
Here, Day was not in custody for purposes of Miranda when he admitted, in *697 response to Costa’s question regarding whether he possessed “anything illegal,” that he possessed marijuana. The place of the arrest suggests that it was merely a brief detention: defendant was outside his own car, in a public place; not inside the guards’ car or at the police station. Only two guards and one car were present at the time of the detention. Further, the officers used their firearms and handcuffs for their own safety, just as in Sinclair and Crittendon. As the government notes, the incident started with a screaming match between multiple individuals, and the guards’ actions were necessary and reasonable to safeguard the situation and ensure the public safety. Terry, 392 U.S. at 20, 88 S.Ct. 1868 (permitting actions “reasonably related in scope to the circumstances which justified the interference in the first place.”); United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (finding officers conducting Terry stops may “take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.”).[8]
As Day was not in custody for Miranda purposes in the earliest moments of his encounter with the officers, Day’s admission during those moments that he possessed marijuana should not have been suppressed as the product of unwarned custodial interrogation.
B.
Once Day admitted that he possessed marijuana, a reasonable law enforcement officer would have probable cause to arrest Day and to search his person incident to the arrest. See U.S. v. Powell, 886 F.2d 81, 83 (4th Cir.1989), abrogated on different grounds, U.S. v. Angle, 230 F.3d 113 (4th Cir.2000). Viewed objectively, as it must be, Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 334 (4th Cir.2009) (citing Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)), that is precisely what occurred here. Thus, Costa’s search of Day’s pants pocket was reasonable: it was fully supported by probable cause to arrest Day, and was incident thereto.
C.
After Day admitted to possessing marijuana and after the marijuana had been seized, the Terry stop initiated by Costa and Slader ripened into a de facto arrest; i.e., custody. That is, after the officers secured the illegal substance, a critical aspect of the encounter shifted: its purpose. Before the drugs were secured, Costa and Slader acted to stabilize a potentially dangerous situation and to investigate the circumstances before them. But when they discovered that Day possessed illegal narcotics, their goal evolved into detaining Day until the local law enforcement arrived. This change in purpose, in combination with the passage of time, alters the *698 custody analysis.[9] See Weaver, 282 F.3d at 312.
While Costa held Day in custody and awaited the arrival of local law enforcement officers, he questioned Day as to the reasons why he was in possession of the weapon. J.A. 24-25. This questioning indisputably qualifies as an interrogation, and as previously explained, Day was in custody during this period. Accordingly, I would affirm the district court’s order suppressing the statements made by Day to officer Costa regarding his ownership and possession of the weapon.
rv.
In sum, Officer Costa essentially conducted a full blown investigation into the circumstances confronting him when he encountered Mario Day on July 5, 2008. The officer entered Day’s vehicle to search it and to seize the handgun he had observed Day place on the floorboard. J.A. 21-22. He detained Day at gunpoint and handcuffed him. J.A. 22. He questioned him regarding Day’s possession of “anything illegal,” and upon learning that Day possessed marijuana, he searched Day’s person and seized the marijuana, as any reasonable and respectable law enforcement officer would. Id. He then proceeded to question Day about the firearm. J.A. 24-25. All these acts were for the benefit of a potential prosecution of Day on any and all criminal offenses that might be laid against him. Virginia law made the collection of the disputed evidence possible. It is difficult to imagine how anyone but a law enforcement officer could have achieved these results.
It is undoubtedly true that the Fourth Amendment “does not provide protection against searches by private individuals acting in a private capacity,” Jarrett, 338 F.3d at 344 (emphasis added). But that is not what the record here shows.
For the reasons stated, I would affirm in part and reverse in part the district court’s order suppressing evidence and remand this case for further proceedings.

. The "state action” inquiry mirrors the “under color of law” inquiry. Lugar, 457 U.S. at 929, 102 S.Ct. 2744; Philips v. Pitt County Memorial Hosp., 572 F.3d 176, 180 (4th Cir.2009) ("The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement — and the analysis for each is identical.”); Haavistola v. Cmty. Fire Co., 6 F.3d 211, 215 (4th Cir.1993).

. This court has been willing to afford an extraordinarily broad construction to the "in the presence” criterion. U.S. v. McNeill, 484 F.3d 301, 312 (4th Cir.2007) (holding that Maryland’s "in the presence” requirement for arrests "does not mandate that every element of the crime occur in the officer's presence, so long as the officer had sufficient evidence of all the elements and some were committed in his presence”).

. The majority argues that the private security guard’s role is the same as a private citizen with respect to arrest authority. See Maj. Op. at 688-89 (citing Hudson v. Commonwealth, 266 Va. 371, 585 S.E.2d 583, 588 (2003)). This assertion is not true. See Va.Code Ann. § 9.1-146. Private security guards have arrest authority that extends beyond crimes committed in their presence. Id.. Additionally, in some cases, the statute actually transforms a private security guard into an "arresting officer,” a privilege never accorded to citizens undertaking citizens’ arrests. Id. It will be the rare citizen who effects an "arrest” employing handcuffs; so-called "bounty hunters” may well comprise a set of one. United States v. Poe, 556 F.3d 1113, 1123-24 (10th Cir.2009), cert. denied, - U.S. -, 130 S.Ct. 395, 175 L.Ed.2d 268 (2009).

. Romanski, 428 F.3d at 640; Rodriguez, 338 F.3d at 355; Payton, 184 F.3d at 627-30; Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423 (10th Cir.1984); Henderson v. Fisher, 631 F.2d 1115, 1118-19 (3rd Cir.1980); Traver v. Meshriy, 627 F.2d 934 (9th Cir.1980); El Fundi v. Deroche, 625 F.2d 195, 196 (8th Cir.1980).

. Arguably, the facts here satisfy the Jarrett/Ellyson test. The second element is fulfilled: the guards clearly intended to assist law enforcement when they detained, searched and interrogated Day. The majority opinion seemingly concedes this point, arguing that this case turns on the test's first element. Maj. Op. at 686-87. Further, Virginia’s statutory scheme comes very close to satisfying the test's first element. The Commonwealth cloaks these guards with a comprehensive imprimatur of state authority. The guards must pass background checks and meet state training requirements, and when they do, the Commonwealth imbues them with expansive arrest and search powers. It even considers them to be, at times, arresting officers. Va.Code Ann. § 9.1-146. Although the Commonwealth may not have advance knowledge of every individual arrest and search undertaken by a private security guard, the same is true of its sworn law enforcement officers. The Commonwealth cannot feign ignorance when armed private security guards do exactly what they are trained, regulated, licensed, and authorized to do: detain and arrest individuals, execute attendant searches, and conduct interrogations of suspects.

. The majority opinion also cites to Virginia court decisions to bolster its approach. Maj. Op. at 689 n. 10. Because this case addresses a federal constitutional issue, I do not find the Virginia courts' analyses particularly useful. Cf. Virginia v. Moore, 553 U.S. 164, 128 S.Ct. 1598, 1608, 170 L.Ed.2d 559 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law.”) Further, the cases cited by the majority do not support its assertion that armed security officers may never be deemed state actors.
The majority cites Goldstein for the proposition that it should consider how the courts of Virginia view the state action issue. Maj. Op. at 689 n. 10. In Goldstein, the court held that a volunteer fire company in Maryland was a state actor under a totality of the circumstances test. Goldstein, 218 F.3d at 348. This court assessed four factors in its analysis: "(1) the indicia of state involvement; (2) the functions carried out by the actor; (3) the nature of the relationship between the state and the actor; and (4) the powers and authorities that had been conferred upon the actor by the state.” Id. The majority is correct that Goldstein states that the courts sometimes consider the state’s analysis as a part of the totality of the circumstances test, although even the majority gives this requirement short shrift, addressing it only in a single footnote added to the last page of the opinion.
But Goldstein actually undercuts the majority’s preferred approach here. The court in Goldstein applied a totality of the circumstances test. Id. at 342. This test is of course the same one rejected by the majority in favor of the crabbed two-pronged approach derived from Ellyson and Jarrett.
Moreover, the Virginia case law cited by the majority fails to support the majority’s case. Mier, Maj. Op. at 689 n. 10, is inapposite because it is factually distinguishable. Mier v. Commonwealth, 12 Va.App. 827, 407 S.E.2d 342 (1991). In Mier, the court held that mall security guards were not public actors because their authority was limited to temporarily detaining apprehended shoplifting suspects. Id. at 346. But the guards in Mier enjoyed significantly less authority than Officers Slader and Costa. The guards drew their authority from Va.Code § 18.2-105.1, a statute that solely permits the detention of suspected shoplifter for one hour pending the arrival of a law-enforcement officer, and Va. Code § 18.2-105, repealed and replaced by § 8.01-226.9, which exempts the detainer from civil liability. Id. at 345.
In Coston, the Court of Appeals of Virginia held that when a registered security officer is “engaged in a duty specifically granted by statute, that officer is a public officer or public employee.” Coston v. Commonwealth, 29 Va.App. 350, 512 S.E.2d 158, 159-160 (1999). In Coston, the security guard was acting pursuant to Va.Code § 19.2-74, which entitles a registered security officer to issue summons. The court treated the officer as a private security guard because he acted pursuant to his duty "specifically granted by statute.” The same reasoning applies to the instant case. Officers Costa and Slader acted pursuant to authority specifically granted by statute when they detained defendant Day for a Terry stop. Va.Code Ann. 9.1-146 ("A registered armed security officer of a private security services business while at a location which the business is contracted to protect shall have the power to effect an arrest for an offense occurring (i) in his presence on such premises.”).

. There is some uncertainty in the record as to whether the district court intended to suppress the marijuana seized from Day under Miranda. In any event, it is settled that the exclusionary rule does not apply to physical evidence discovered as a result of a Miranda violation. United States v. Patane, 542 U.S. 630, 634, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004); U.S. v. Sterling, 283 F.3d 216, 219 (4th Cir.2002). Day does not contend otherwise. Rather, he argues that the marijuana was properly suppressed as the fruit of an unreasonable search under the Fourth Amendment. For the reasons stated in text, I reject this contention.

. To be sure, some factors do militate in favor of a finding of custody. The officers commanded Day to "freeze” as they ran towards him. At least one gun was pointed at Day the entire time, and he was handcuffed and frisked. J.A. 22. The detention occurred in the middle of the night, more than one guard was present, and Day’s liberty was severely restricted. J.A. 20-21, 31. These factors would make a reasonable person believe that he was not free to leave, but under Fourth Circuit precedent, shouting, guns, and handcuffs do not instantaneously transform the guards’ stop into an arrest — -instead, courts must analyze the totality of the circumstances. Ultimately, the circumstances here comprise a Terry stop-and-frisk and not Miranda custody. U.S. v. Moore, 817 F.2d 1105, 1108 (4th Cir.1987) (collecting cases and concluding that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes).

. Although the proper analysis is whether a reasonable man in the suspect's position would have understood that he was in custody, Berkemer, 468 U.S. at 422, 104 S.Ct. 3138, it is telling that the local law enforcement officer testified that when he arrived, Costa and Slader held Mario Day “in custody.” J.A. 45.